**In re SALOMON ANALYST LEVEL 3 LITIGATION**

**In re Salomon Analyst XO Litigation**

**In re Salomon Analyst Williams Litigation**

**Nos. 02 Civ.6919 GEL, 02 Civ.8114 GEL, 02 Civ.8156 GEL.**

United States District Court, S.D. New York.

Dec. 2, 2004.

Joseph H. Weiss, David C. Katz, Jack Zwick, Weiss & Yourman, New York City; Daniel A. Osborn, Christopher J. Marino, Beattie & Osborn LLP, New York City; Jacqueline Sailer, Gregory Linkh, Rabin, Murray & Frank LLP, New York City, Lead Counsel in Level 3 Litigation and Attorneys for Lead Plaintiffs Richard Garland, Douglas Lippold, and Charles Fuller.

Jill S. Abrams, Richard B. Margolies, Abbey Gardy, LLP, New York City; Robert S. Green, Robert A. Jigarjian, Green & Jigarjian, LLP, San Francisco, CA, Lead Counsel in XO Litigation and Attorneys for Lead Plaintiffs Donald C. and Diane P. Schutt, Hansel and Julie Osborne, and Russ Land.

Frederic S. Fox, Donald R. Hall, Kaplan Fox & Kilsheimer LLP, New York City, Lead Counsel in Williams Litigation and Attorneys for Lead Plaintiffs Small & Khalidy Investments, Richard P. Small Trust, Clarence L. Bevington, and Gary A. Brom.

Martin London, Richard A. Rosen, Brad S. Karp, Eric S. Goldstein, Joyce S. Huang, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York City; Peter K. Vigeland, Wilmer, Cutler & Pickering, New York City, for defendants Citigroup Inc., Salomon Smith Barney, and Jack Grubman.

## OPINION AND ORDER

LYNCH, District Judge.

These three related cases concern allegations that the defendant bank Citigroup, Inc. ("Citigroup"), its division Salomon Smith Barney ("SSB"), and its research analyst Jack Grubman engaged in scheme to defraud purchasers and sellers of stock in three emerging telecommunications companies—Level 3 Communications ("Level 3"), XO Communications ("XO"), and Williams Communications Group ("Williams")—and to enrich themselves, by issuing and disseminating research analyst reports on these companies that were materially false and misleading. The purpose and motivation for the allegedly false and misleading reports was to garner lucrative investment banking business for the investment banking division of SSB, which would then increase Grubman's personal compensation. Defendants have moved to dismiss the Complaints pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief can be granted, and for failure to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b). For the reasons that follow, the motions will be granted in significant part, and denied only as to reports issued on or after April 18, 2001.

## BACKGROUND

For purposes of adjudicating the motion to dismiss, the facts alleged in the Complaint must be accepted as true.

## I. *Common Factual Allegations*

Defendant Citigroup is one of the largest financial services firms in the world. At the relevant time, Citigroup was the parent corporation of defendant Salomon Smith Barney ("SSB"), through which Citigroup provided investment banking services to businesses, retail brokerage services to both individuals and institutional investors, and published research reports and ratings on publicly-traded securities. In April 2002, SSB changed its corporate name to Citigroup Global Markets, which maintains the same headquarters as SSB and is its successor-in-interest.[1] Defendant Jack Grubman was a Managing Director at SSB and was considered its leading telecommunications industry analyst; Grubman resigned from SSB by mutual agreement in 2002. During his tenure at SSB, Grubman was the firm's highest paid analyst and developed a larger-than-life reputation in the industry, with press references as the "god" of telecom or the "ax" of his sector, and the rumored ability to "make or break newcomers to the [telecom] industry."

Although SSB maintained publicly that its research analyst and investment banking divisions were separate, had no conflicts of interest, and did not unduly influence each other, from at least 1997 SSB employed compensation structures and other mechanisms that created incentives for analysts to inflate their ratings of com-

1. Certain plaintiffs refer to SSB's successor entity as Citigroup *Capital* Markets ("CCM"), which defendants assert in their brief is actually a company that is part of Citigroup's asset management business and has no connection to the events alleged in the Complaint. Defendants thus urge that CCM be dismissed from the relevant cases. However, for purposes of these motions, the distinction between "Capital" and "Global" matters not. In each instance, plaintiffs are clearly referring to the corporate successor of SSB, and the true facts as to the identity of that entity will be easy to ascertain in discovery, for those cases which survive the present motions. If defendants are correct, the relevant plaintiffs will either stipulate to the dismissal of CCM or CCM will prevail on summary judgment. But on a motion to dismiss, the factual allegations in the Complaint are accepted as true.

panies in order for SSB to secure lucrative investment banking business from those companies. For example, SSB paid "helper's fees" to analysts, which were based on the amount of investment banking fees earned from transactions involving companies covered by that analyst. By 2000, SSB had revamped and expanded the "helper's fee" system by creating a "scorecard" for each analyst that listed the investment banking fees earned from companies in that analyst's coverage sector, and requiring analysts to detail their contributions to investment banking transactions as part of determining the analyst's annual compensation. In addition, analysts came under direct pressure from the investment banking division to tailor their coverage to avoid angering companies that SSB was pursuing for lucrative investment banking business.

SSB executives encouraged an interplay between research and investment banking as being in the best interest of the firm as a whole, describing analysts as "the key element in banking success," directing analysts to assist bankers in creating "pitch-books" for business form companies in their sectors and to participate in road-shows, and advising analysts to "obtain collaborative feedback from their investment banking counterpart regarding establishing and modifying a list of coverage priorities." Training seminars conducted within the firm instructed analysts on how using more conservative assumptions in their financial modeling could relieve the short-term pressure on covered companies to meet Wall Street's projections. The overall message at these seminars was for analysts to see themselves as "partners" with the investment banking division of SSB, which was the most significant source of revenue for the firm.

By 2001, the "tech sector" (particularly new internet and telecom companies) that had fueled much of the tremendous boom in the stock market in the nineties was imploding, with dramatic price drops across the board and numerous bankruptcy filings, and some executives at SSB were acknowledging the strain on objectivity that the firm's policies may have created and urging a different approach. Executives in the research division criticized the "excessive optimism" that had led to ever-higher target prices for some stocks and noted the "failures of analysis," particularly in the assumptions underlying financial projections, that allowed the boosterism to continue. These executives acknowledged privately that there might be "legitimate concern about the objectivity of our analysts which we must allay" going forward in 2001. Executives from SSB's retail brokerage division, faced with the wrath of customers who, like nearly all stock market investors, had seen the value of their portfolios erode considerably, also criticized the role that overly-optimistic research may have played, calling the output of SSB's research division "basically worthless" and rating Grubman SSB's worst analyst.

Beginning in April 2001, some of these sentiments were echoed by Grubman himself. On April 18, 2001, Winstar (another telecom company covered by Grubman) filed for bankruptcy. In response, Frank Yeary, an investment banker at SSB, sent an email to a group of telecom bankers and analysts at SSB, suggesting a conference call "as soon as practicable to discuss the credit position and business prospects" of other companies in the sector, specifically naming Level 3, XO, and Williams, among others. Grubman responded the same day, noting that "to be blunt, we in research have to downgrade stocks lest our retail force ... end up having buy-rated stocks that go under. So part of this [conference] call will be our view that [Level 3, XO, Williams, and other named

telecom companies] must not remain buys." In the same email, Grubman identified a group of telecom companies that had "no funding issues"—as contrasted with the list of companies, including Level 3, XO, and Williams, in the preceding sentence. On June 25, 2001, in an email to the head of U.S. Research Management at SSB, Grubman wrote that "most of our banking clients are going to zero and you know I wanted to downgrade them months ago but got huge pushback from banking." In another internal email written the same day, Grubman expressed similar frustration, commenting to a colleague, "I have dinner with [two SSB investment bankers] I bet to discuss banking's displeasure with our commentary on some names. Screw 'em. We should have put a Sell on everything a year ago."

Plaintiffs allege that SSB and Citigroup never disclosed to investors the conflicts of interest created by the formal and informal connections between research and investment banking.[2] According to the Complaints, these connections went beyond merely encouraging optimism, but became an actual scheme to defraud, in which the carrot of additional compensation and the stick of institutional pressure, including the possibility of termination, provided the motivation for SSB analysts to deliberately falsify their research reports and ratings to make them more favorable than their honestly-held opinions about the companies and their stock. In particular, plaintiffs allege that the conflict of interest created by SSB's policies and actions motivated Grubman to publish false and misleading research reports on Level 3, XO, and Williams.

## II. The Level 3 Research Reports

Level 3 was spun off from a broad-based construction company in March 1998, and, among other things, provides telecommunications and other information services through an international fiber-optic network. Level 3 stock began trading on the NASDAQ market on April 1, 1998, with an opening-day price of $79.50 per share. SSB and Grubman began covering Level 3 on January 4, 1999, with a rating of "Outperform"[3] and a 12–18–month "target price" of $54 per share. The opening price for Level 3 on January 4 was $43, and the stock closed that day at $41. (Level 3 Consolidated Amended Complaint ¶¶ 53, 57, 103.)

On February 22, 1999, Grubman issued another positive report on Level 3, noting that the company was "a great play on bandwidth" and had "a strong management team that is critical for success in this business." The February 22 report maintained the Outperform rating and raised the target price for Level 3 stock from $54 to $70 per share. (Id. ¶ 62.) Level 3 stock had closed at $57 on February 19, the previous trading day, and closed at $59 on February 22, although the price returned to $57 by February 24. (Id. ¶ 104.) On July 22, 1999, Grubman

2. Throughout the relevant timeperiods, SSB provided underwriting services to Level 3, XO, and Williams for various stock and debt offerings. SSB received allotments of the stock and notes in these offerings as well as underwriting and other advisory fees. However, each report at issue in these complaints contained a disclosure that "[w]ithin the past three years, [SSB] has acted as manager or co-manager of a public offering of the securities of this company," and that SSB "may from time to time perform investment banking or other services for, or solicit investment banking or other business from, any company mentioned in this report."

3. SSB had a five-tier rating system for stocks: Buy, Outperform, Neutral, Underperform, and Sell. In practice, the lowest two categories were rarely, if ever, employed by SSB analysts.

issued a report titled "Strong Second Quarter Earnings," which reiterated the Outperform rating and the target price of $70. (*Id.* ¶ 65.) The July 21 closing price was $63 per share, although the stock had traded as high as $93 on several occasions in the previous five months. On the day the July 22 report was issued, Level 3 stock closed down several points at $60.

On October 22, 1999, Grubman upgraded Level 3 to a "Buy" rating and raised the target price to $80. (*Id.* ¶ 67.) The previous day's closing price was $57, and the stock had typically traded within a $10 band of that value since July. Level 3 closed at $62 on October 22. (*Id.* ¶ 105.) Several months later, on January 20, 2000, Grubman raised the target price for Level 3 stock to $130 per share, keeping his Buy rating. Level 3 stock had been generally trending upward since Grubman's October 1999 report, and the closing price on the day preceding the January 20 report was nearly $95 per share. The Buy rating and $130 target price were reiterated in Grubman's research reports on Level 3 throughout 2000 and early 2001—on July 20, September 27 and 28, October 18, and January 30, 2001. (*Id.* ¶¶ 68, 74–77, 106.) Level 3 traded at a high of $132 on March 10, 2000, but by January 2001 was fetching prices only in the $40s. (*Id.* ¶¶ 107–111.)

By April 2001, Level 3's stock had dropped dramatically, closing as low as $9.65 on April 4, 2001. On April 18, 2001, the same day in which he'd noted in an internal email his view that Level 3 "must not remain a buy" and implied that the company had "funding issues" and was at some risk of "go[ing] under," Grubman issued a report on Level 3 in which he maintained the Buy rating, but drastically slashed the target price from $130 to $20 per share. (*Id.* ¶ 80.) Level 3 closed at $14.90 on April 17, $13.06 on April 18, $14.43 on April 19, and $15.27 as the trading week ended on April 20. (*Id.* ¶¶ 112–113.)

For the remainder of the spring, Level 3 bounced around at prices in the mid-teens, finally dropping to single-digits on June 8, 2001, when the stock closed at $9.29 per share. A week later on June 15, Level 3 closed at $7.62 per share. On Monday, June 18, 2001, Grubman issued a report downgrading Level 3 two rating categories, to Neutral, and lowering the target price from $20 to $8 per share. (*Id.* ¶¶ 86, 114.) Level 3 closed at $5.97 on June 18 and traded at around $5 per share over the following two weeks. (*Id.* ¶ 114.)

Plaintiffs filed this litigation on August 30, 2002, and filed the Consolidated Amended Complaint ("Level 3 Complaint") on October 15, 2003.[4] In addition to proposing a class of all persons who purchased securities of Level 3 between January 4, 1999, and June 18, 2001, the Level 3 Complaint brings the following claims on behalf of that class: (i) against Grubman and SSB for violations of section 10(b) and Rule 10b–5 for material misstatements and omissions concerning both the ratings and reports on Level 3 and the conflicts of interest between research and investment banking, which artificially inflated the price of Level 3 securities during the class period; and (ii) against SSB and Citigroup for violations of section 20(a) as control persons of Grubman with respect to the Level 3 research reports.

## III. *The XO Research Reports*

XO is a telecommunications company that provides local and long distance call-

---

4. The first action filed was *Pfeiffer v. Salomon Smith Barney,* No. 02 Civ. 6919(BSJ) (S.D.N.Y. August 30, 2002). By Order dated January 24, 2003, this Court consolidated the *Pfeiffer* action with six related actions as *In re Salomon Analyst Level 3 Litigation,* No. 02 Civ. 6919(GEL).

ing service, digital subscriber lines, internet access services, private date networking, and web hosting over its international fiber-optic broadband network. (XO Consolidated and Amended Class Action Complaint ¶ 21, 32.) Prior to September 25, 2000, XO was known as Nextlink Communications. (*Id.* ¶¶ 29–31.) Although SSB and Grubman had covered XO's predecessors companies since September 1997, consistently giving the stock a "Buy" rating, plaintiffs do not allege that the reports were false and misleading prior to January 18, 2000.

On January 18, 2000, shortly after Nextlink had announced a merger with a company called Concentric, Grubman issued a report that reiterated the long-standing Buy rating for Nextlink and raised the target price from $70 to $115 per share. The report noted that the new target price was derived from a new valuation model that was designed to incorporate the Concentric acquisition. (*Id.* ¶ 77.) Reports issued on February 15 and April 25, 2000, each reiterated the Buy rating and the $115 target price for Nextlink's shares. (*Id.* ¶¶ 75, 79.) On July 26, 2000, Grubman lowered the target price for Nextlink to $60, keeping the Buy rating.[5] This lower target, and the Buy rating, was maintained over the next five reports, issued on August 23, September 25, October 30, and November 28, 2000, and February 5, 2001. (*Id.* ¶ 75.)

Grubman and his analyst team used discounted cash flow (DCF) modeling to support their valuations and target prices—a common practice in the financial industry. Constructing a DCF model requires the analyst to make a number of judgment calls about a company's financial prospects and the likely future growth and profit potential of its industry, as well as growth rates for the economy as a whole, including financial and credit markets. SSB had internal guidelines for some of these underlying assumptions informing a DCF model, and the model used for XO during the relevant timeperiod allegedly deviated from those guidelines in several respects. (*E.g., id.* ¶¶ 65–72.)

On April 26, 2001, about a week after Grubman noted in an internal email that XO, among other companies, "must not remain Buys," SSB issued another report on XO that reiterated the long-standing Buy rating, but sharply lowered the target price to $10 per share. (*Id.* ¶ 75.) On May 31, 2001, Grubman exchanged emails with one of his staff analysts, Sheri McMahon, about Merrill Lynch's decision to downgrade XO. Grubman commented. "I hope we were not wrong in not downgrading," and asked McMahon to "try to talk to folks and see what they think of these downgrades. Maybe we should have done like I wanted to. Now it's too late." McMahon, who was listed as a co-author on a number of the XO research reports, replied that "XO is a lost cause, its [*sic*] never too late to do the call, we could downgrade XO...." (*Id.* ¶ 89.) On July 19 and 25, 2001, Grubman issued reports on XO that maintained the Buy rating and the April target price of $10 per share. (*Id.* ¶ 97.)

By November 1, 2001, XO's shares had fallen to below $1 per share. In a "Morning Meeting Note" on November 1, Grubman downgrade XO to Neutral and lowered the target price to $1. (*Id.* ¶ 98.) SSB dropped

---

5. The XO Complaint states in one place that the July 26, 2000, report maintained the previous $115 target price, and in another that the price was dropped to $60 in that report. (Compare *id.* ¶ 75 to ¶ 79.) The face of the report reveals that the target price was $60, and that it reflected a change from the prior report, from an earlier target of $58. It is not clear when the $58 target price was set.

coverage of XO after the company's November 28, 2001, announcement that it would be "restructuring its balance sheet" with the help of cash infusions from venture capitalists that would erase the equity value of the company's outstanding common stock. (*Id.* ¶ 100.)

Plaintiffs filed this litigation on October 11, 2002, and filed the Consolidated and Amended Class Action Complaint (the "XO Complaint") on October 15, 2003.[6] In addition to describing a proposed class of purchasers of Nextlink or XO securities during the period from January 18, 2000, through November 1, 2001, the XO Complaint brings the following claims on behalf of this class: (i) against Grubman and SSB for violation of section 10(b) and Rule 10b–5 for material misstatements and omissions with respect to the XO research reports, including that such reports falsely stated Grubman's true opinions and failed to disclose the conflicts of interest created by SSB's internal policies, which artificially inflated the price of XO securities; (ii) against SSB and Citigroup for violations of section 20(a) as "control persons" of Grubman, related to his materially misleading research reports on XO.

IV. *The Williams Research Reports*

Like Level 3 and XO, Williams was a provider of broadband telecommunications services, and invested enormous sums in creating the fiber-optic system necessary to provide those services. Williams made an initial public offering of its common stock on October 1, 1999, and SSB and Grubman initiated research coverage on October 27, 1999, with a Buy rating and a 12–to–18–month target price of $46 per share. (Williams Consolidated Class Ac-

tion Complaint ¶ 57.) Grubman reiterated the Buy rating and the $46 target in a report issued February 7, 2000. (*Id.* ¶ 58.)

On February 25, 2000, Grubman raised the target price for Williams to $70 per share, continuing to rate the stock a Buy. The report noted that the new target price was based on "updated forecasts for the size of the wholesale telecom market and [Williams'] plan to extend its network in 50 U.S. cities." (*Id.* ¶ 59.) The Buy rating and $70 target price were reiterated by Grubman in reports issued on October 25, 2000, and February 5, 2001. (*Id.* ¶¶ 62, 65.) These reports also continued to emphasize Grubman's view that Williams's value was supported by its vast fiber-optic network and low cost structure, which positioned the company to benefit handsomely for what Grubman believed was a growing demand for broadband capacity. (*Id.* ¶¶ 62, 66.)

On May 1, 2001, approximately two weeks after Grubman had noted in internal emails that he believed Williams "must not remain [a] Buy," he issued a report that drastically reduced the target price for Williams stock from $70 to $15 per share, but maintained the Buy rating. (*Id.* ¶ 71.) The report contained the usual catalog of pluses and minuses in recent events and company announcements, and ended by noting that "[w]hile execution and some funding risks remain, we feel at these levels ... that it would be appropriate to be more aggressive on [Williams]." (*Id.*) The closing price for Williams before this report was issued was $4.55 per share.

By August 1, 2001, Williams was trading at $2.25 per share. Grubman issued another report on this date, again lowering the target price, this time to $7 per share,

---

**6.** The first action filed was *Vine v. Salomon Smith Barney*, No. 02 Civ. 8114(BSJ) (S.D.N.Y. Oct. 11, 2002). By Order dated January 24, 2003, this Court consolidated the *Vine* action with seven related actions as *In re Salomon Analyst XO Litigation*, No. 02 Civ. 8114(GEL).

but maintaining the Buy rating for the stock. (*Id.* ¶ 79.) Similarly, the September 21, 2001, report continued to rate Williams a Buy, but lowered the target price to just $2. Williams closed the previous trading day at $1.36 per share. (*Id.* ¶ 80.) During the balance of September and throughout October, Williams traded between $1.11 and $1.69 per share. On November 1, 2001, after Williams had issued what the Complaint describes as a "particularly negative earnings release," Grubman issued a report that maintained the $2 target price, but lowered the rating two categories from Buy to Neutral. (*Id.* ¶ 81.) The report was issued after the close of trading on November 1, when Williams closed at $1.56. The following day Williams lost 10.4% of its value relative to the performance of the "composite index." (*Id.* ¶¶ 81, 104.) Williams filed for chapter 11 protection in 2002; its equityholders received no distribution and its outstanding shares were cancelled by the reorganization plan.

Plaintiffs filed this litigation on October 15, 2002, and filed the Consolidated Class Action Complaint ("Williams Complaint") on October 15, 2003.[7] In addition to describing a proposed class of all purchasers of Williams securities from October 27, 1999, through November 1, 2001, the Williams Complaint brings the following claims on behalf of that class: (i) against SSB and Grubman for violations of section 10(b) and Rule 10b–5 for material misstatements and omissions in the Williams research reports, including the true opinion as to the proper rating for the stock, the proper target price, the facts and valuation models supporting those conclusions, and the conflicts at SSB between research and investment banking; (ii) against SSB and Citigroup for violations of section 20(a) as control persons of Grubman; (iii) against SSB for violations of the Investment Advisers Act, on behalf of those class members who maintained Guided Portfolio Management ("GPM") accounts with SSB; (iv) against SSB for breach of fiduciary duty, on behalf of those class members with GPM accounts; and (v) against SSB for breach of contract, on behalf of those class member with GPM accounts.

## DISCUSSION

### I. Standard on a Motion to Dismiss

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the plaintiff, drawing all reasonable inferences in its favor. *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir.1996). The Court will not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Beyond the facts in the complaint, the Court may consider "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).

In general, the Federal Rules of Civil Procedure require only notice pleading and, to be deemed adequate at the pleading stage, a complaint need not use particular words nor demonstrate that plaintiff

---

7. The first action filed was *Weber v. Salomon Smith Barney*, No. 02 Civ. 8156(BSJ) (S.D.N.Y. Oct. 15, 2002). By Order dated January 24, 2003, this Court consolidated the *Weber* action with nine related actions as *In re Salomon Analyst Williams Litigation*, No. 02 Civ. 8156(GEL).

will prevail on the merits, but need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512–13, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting Fed.R.Civ.P. 8(a)). However, where, as here, plaintiff alleges fraud, the complaint must state "the circumstances constituting fraud ... with particularity." Fed.R.Civ.P. 9(b); *see Stern v. Gen. Elec. Co.,* 924 F.2d 472, 476 (2d Cir.1991) ("[A]llegations of fraud must be supported by particular statements indicating the factual circumstances on which the theory of fraud is based."). "Rule 9(b) is designed to further three goals: (1) providing a defendant fair notice of plaintiff's claim, to enable preparation of defense; (2) protecting a defendant from harm to his reputation or goodwill; and (3) reducing the number of strike suits." *DiVittorio v. Equidyne Extractive Indus.,* 822 F.2d 1242, 1247 (2d Cir.1987).

## II. *Section 10(b) Claims*

### A. *Legal Standard*

The Securities Exchange Act protects investors by proscribing,

> in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5, promulgated by the Commission, makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b);

*see SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 847–48 (2d Cir.1968) (explaining that the SEC "promulgated [Rule 10b–5] pursuant to the grant of authority given the SEC by Congress in Section 10(b) of the Securities Exchange Act of 1934," by which Congress sought "to prevent inequitable and unfair practices and to insure fairness in securities transactions generally, whether conducted face-to-face, over the counter, or on exchanges").

### B. *Heightened Pleading Requirements*

For federal securities fraud claims, the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104–67, 109 Stat. 737, reinforces the heightened pleading standards that apply to all claims of fraud or mistake under Federal Rule of Civil Procedure 9(b). Under the PSLRA, complaints alleging securities fraud must, first, "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed," 15 U.S.C. § 78u–4(b)(1)(B); and second, "with respect to each act or omission alleged ...., state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2); *see Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir.2001). That state of mind is scienter, which means "intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *see also Kalnit,* 264 F.3d at 138 (same).

The Second Circuit has made clear, however, that the PSLRA "did not change the basic pleading standard for scienter in this circuit." *Novak v. Kasaks,* 216 F.3d 300, 310 (2d Cir.2000); *see also Kalnit,* 264

F.3d at 138 (same). Both before and after the PSLRA, the law required plaintiffs bringing claims under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, to allege scienter with particularity. *Id.; compare Novak,* 216 F.3d at 307 (emphasizing that securities fraud allegations must "give rise to a strong inference of fraudulent intent"), *with* 15 U.S.C. § 78u–4(b)(2) (codifying the PSLRA's requirement that securities fraud complaints "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]").

## C. *Application to this Case*

█ To state a cause of action under section 10(b) and Rule 10b–5, a plaintiff must allege that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused injury to the plaintiff." *Lawrence v. Cohn,* 325 F.3d 141, 147 (2d Cir.2003) quoting *Ganino v. Citizens Util. Co.,* 228 F.3d 154, 161 (2d Cir.2000). *See In re WorldCom, Inc. Securities Litigation,* 294 F.Supp.2d 392, 410 (S.D.N.Y.2003).

### 1. *Pleading Falsity and Scienter*

Defendants argue that the claims in the Level 3, XO, and Williams Complaints must be dismissed because they fail to plead falsity and scienter with the particularity required by Rule 9(b) and the PSLRA. (Level 3 D. Mem. 15–26; XO D. Mem. 13–28; Williams D. Mem. 15–25.) In support of this argument, defendants make four related points: (i) the Complaints identify no false statement of objective fact in the research reports; (ii) the Complaints do not adequately plead that Grubman's opinions were objectively unreasonable or not truly held; (iii) general-ized allegations of conflicts of interest are insufficient to adequately plead fraud; and (iv) the research reports are protected by the "bespeaks caution" doctrine.

█ It is well established that liability under section 10(b) can be predicated on statements of opinion, where it can be shown not merely that a proffered opinion was incorrect or doubtful, but that the speaker deliberately misrepresented his actual opinion. *See Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1095–96, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). However, to survive a motion to dismiss on a false statement of opinion claim, a plaintiff "must 'allege with particularity' 'provable facts' to demonstrate that the statement of opinion is both objectively and subjectively false." *Bond Opportunity Fund v. Unilab Corp.,* No. 99 Civ. 11074(JSM), 2003 WL 21058251, at *5 (S.D.N.Y. May 9, 2003), citing *Virginia Bankshares,* 501 U.S. at 1093–98, 111 S.Ct. 2749. It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, not borne out by subsequent events, or any other characterization that relies on hindsight or falls short of an identifiable gap between the opinion publicly expressed and the opinion truly held.

█ In addition, to adequately plead scienter, the plaintiff must allege "an intent to deceive, manipulate or defraud," *Kalnit,* 264 F.3d at 138 (internal quotations omitted), by pointing to specific "facts that give rise to a strong inference of fraudulent intent." *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995). The "strong inference" may be supported either by "(a) . . . facts to show that defendants had both motive and opportunity to commit fraud, or (b) . . . facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.; see also In re WorldCom,* 294 F.Supp.2d at

411–12. Although in the typical case falsity and scienter are different elements, in a false statement of opinion case the two requirements are essentially identical. For example, in a case where a material misstatement of fact is alleged, the statement may be both objectively false *and* believed in good faith by the speaker to be true. However, in contrast, a material misstatement of opinion is by its nature a false statement, not about the objective world, but about the defendant's own belief. Adequately alleging the falsity of a statement like "I believe XO will become profitable" is the same as adequately alleging scienter on the part of the speaker, since the statement (unlike a statement of fact) cannot be false at all unless the speaker is knowingly misstating his truly held opinion. *See Demarco v. Lehman Bros.*, 309 F.Supp.2d 631, 635 (S.D.N.Y. 2004)

a. *Reports prior to April 18, 2001*

█ For all statements in the research reports issued prior to April 18, 2001, plaintiffs in these three cases fall far short of the standards for adequately pleading that Grubman (and, by extension, SSB) was misstating his truly held opinion on the stock of Level 3, XO, or Williams. The clear and consistent message of Grubman's statements, obvious from even a casual perusal of the allegedly false research reports, is that Grubman was extremely bullish on the future potential of high-speed broadband telecommunications networks and thus on the investment value of companies who were well-positioned to capitalize on that potential by virtue of their network assets, disciplined cost structures, and strong management teams.[8] There is no indication in the reports themselves or in any contemporaneous documents that anything in these reports did not represent Grubman's actual opinions.

Although plainly very optimistic about the future prospects of these companies, Grubman also clearly noted in each report the risks and problems that might prevent any one company from succeeding. Each and every report on each of these three companies clearly bore the label "Speculative"—the second-riskiest rating, and a category SSB analysts employed for stocks that were marked by "very low predictabil-

---

**8.** *See, e.g.,* February 22, 1999, Level 3 Report at 7 ("We view the telecom landscape as a continual value chain of assets and capabilities.... [W]e believe that the value of these stocks [like Level 3] will perpetually rise as long as management executes."); September 28, 2000, Level 3 Report at 2 ("Level 3 is optimizing the bandwidth layer of the telecom value chain.... As an IP-only network, we expect Level 3 to enjoy significant cost savings over traditional telephony networks."); January 18, 2000, XO Report ("The demand for bandwidth is explosive ... applications ... are going to drive demand for bandwidth to a degree with which supply will not be able to keep up. Thus any worries about capacity glut should be forever buried.... We believe the geographic and services expansion of these companies [like XO] is such that with management teams that are all proven can become companies that have $40–50 billion market caps in the not-too-distant future."); October 30, 2000, XO Report at 4 ("[XO] has a very good set of assets in our view, and this quarter is no exception to demonstrating management's firm capabilities in executing a business plan that maximizes the value of those assets."); February 7, 2000, Williams Report ("We continue to believe there is value to be created by those that optimize one part of the telecom value chain. We believe Williams network expertise is top notch.... Furthermore, its management is very adept at building networks and product capabilities.... Thus, we believe Williams will be a beneficiary of the growing demand for bandwidth which we believe grows as more bandwidth is deployed."); October 25, 2000, Williams Report at 2 ("With its vast [fiber-optic] network and low cost structure we believe [Williams] will continue to be a beneficiary of the growing demand for bandwidth.").

ity of fundamentals and a high degree of volatility, suitable only for investors/traders with diversified portfolios that can withstand material losses." This description of the rating was carried on each report. In addition to this general risk label, the reports detail specific risk factors and negative indicators relevant to the analyzed stock and the telecom industry as a whole.[9]

The reports also lay out the underlying analysis on which Grubman based his opinion on the particular stock's rating and target price.[10] The reports are detailed, transparent, and primarily based on the companies' own public statements, such as press releases, financial statements, and analyst calls.[11] Plaintiffs have not identified any objective facts or data that are misrepresented in the reports. Furthermore, plaintiffs' efforts to undermine the analysis or models employed by Grubman as false or objectively unreasonable are either refuted on the face of the reports themselves, or rely entirely on mischaracterizations of emails written by *other* SSB employees months or even years after the allegedly false research reports, which is plainly insufficient to adequately plead that the analysis or models were objectively false or misrepresented the true opinions of Grubman or his staff at the time the reports were issued.[12]

■ Stripped of their hyperbolic and conclusory language, the Complaints es-

9. *See, e.g.,* March 21, 2001, "State of the Union" Report ("XO Communications has big losses to eat through and large funding requirements but has great assets and management.... Level 3 has built a very impressive array of assets [but] we worry if Level 3 will light up its network on time; a delay in lighting could forestall capacity sales.... [Williams] has a full array of recurring network services, but unfortunately it needs to address a funding gap of more than a billion dollars.").

10. *See, e.g.,* July 22, 1999, Level 3 Report ("Note, Level 3 has changed its revenue recognition policy with respect to reciprocal compensation, in that it has elected to not recognize it until received. We had no reciprocal compensation revenue in our model for the second quarter of 1999 and have none going forward."); Oct. 24, 2000, Telecommunications Services Report ("We attempt to reflect in our models current (i.e. forward-looking) cost of debt when markets become disrupted as opposed to reflecting the rates on bonds when money was raised. Thus, for those companies where the debt is trading well—such as [XO]—the discount rate goes down as a result of a lower risk premium."); Feb. 25, 2000, Williams Report ("Our new model assumes less than 10% market share of WCG's addressable market which we have narrowly defined as the pure U.S. wholesale market.... In addition to the changes in the market size assumptions, we raised our terminal multiple from 13x to 16x at the midpoint.... Our new DCF ... is reasonable given that....").

11. *See, e.g.,* Oct. 18, 2000, Level 3 Report (Level 3 "reported 3Q00 results basically in line with our published model. Specifically, [Level 3] reported total revenues of $341 million (see table below for detailed revenue segmentation.)"); July 26, 2000, XO Report ("The [XO] management team understands this [ability to execute].... Chairman and CEO Dan Akerson stated, 'It continues to be important for [XO] to remain relentlessly focused on delivering strong results.'.... [XO]'s set of voice products is being augmented by an aggressive rollout of DSLAMs ... [XO] currently has 125 of its 275 Colo's equipped with [XO]-installed DSLAMs."); Feb. 7, 2000, Williams Report ("WCG reported strong Q4'99 results w/revs exceeding expectations.... WCG is expected to go into more detail re: their broadband opportunity at analyst meeting on Feb. 10th.").

12. *Compare, e.g.,* XO Complaint ¶ 65 *with* XO Rosen Decl., Ex. 24 (equity strategy report authored by analyst in a different department on June 28, 2001) *and* XO Rosen Decl., Exs. 32 and 33 (August 22, 2001, Memo describing new levels of supervision on target prices; and July 2, 2001, Email from Timothy Tucker to all SSB U.S. Equity analysts with technical guidance on constructing DCF models).

sentially accuse Grubman of being unduly, even egregiously, optimistic about the future prospects of these companies. But, with the exceptions discussed below, the worst that the accusations amount to is that Grubman was incompetent, a bad analyst, even careless. (*See, e.g.,* Williams Complaint ¶ 47 (Grubman rated SSB's worst analyst by retail brokers); Level 3 Complaint ¶ 95 (Grubman's foundational belief in demand for bandwidth was not validated, only about 5% of fiber-optic capacity is in use today); XO Complaint ¶ 72 (Grubman used valuation models that predicted very high return rates outside SSB's guideline range).) It *is* well-established in the Second Circuit that forward-looking recommendations and opinions are not actionable in securities fraud merely because they are misguided, imprudent or overly optimistic. *See Stevelman v. Alias Research, Inc.,* 174 F.3d 79, 85 (2d Cir. 1999); *Shields v. Citytrust Bancorp Inc.,* 25 F.3d 1124, 1129 (2d Cir.1994) ("misguided optimism is not a cause of action, and does not support an inference of fraud.").

True, Grubman profited handsomely from his role as evangelist for the broadband future, and the staggering levels of his compensation may have compromised his objectivity as an analyst or blinded him to countervailing factors that a less-conflicted analyst might have weighted more heavily. (*E.g.,* Williams Complaint ¶ 87 (Grubman earned $14 million in 1998, $25 million in 1999, and $10 million in 2001).) But speculation about the potential for compromised objectivity is a significant step away from deliberate lies. Moreover, Grubman was hardly alone in his enthusiasm for start-up technology companies or his view that these highly speculative stocks were worthy of investment—many analysts and investors shared these views at the time, including the risk-seeking purchasers who make up the proposed plaintiff classes here. Even if one credits the

plaintiffs' view that Grubman was excessively optimistic, merely being the most blotto of all the drunken sailors on shore leave does not amount to securities fraud.

■ Other than their hindsight portrayal of Grubman as too optimistic, the sole basis for plaintiffs' claims that reports prior to April 18, 2001, misstated Grubman's true opinion are the set of allegations about the conflicts of interest and institutional pressures at SSB related to investment banking business with Level 3, XO, and Williams. (*E.g.,* Common Factual Allegations, *above;* Level 3 Complaint ¶¶ 25–47; XO Complaint ¶¶ 102–127; Williams Complaint ¶¶ 32–49.) However, as this Court and others have noted, generalized allegations about conflicts of interest, incentives to increase compensation, or internal pressure on analysts that is not tied to the particular stock at issue are not sufficient, standing alone, to satisfy the particularity requirements. *See Podany v. Robertson Stephens, Inc.,* 318 F.Supp.2d 146, 156 (S.D.N.Y.2004); *In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation,* 273 F.Supp.2d 351, 373 (S.D.N.Y.2003) ("the pleading of a motive to issue false statements does not establish that false statements were in fact issued.").

Although defendants correctly point out that SSB disclosed its investment banking activity for these companies and that the lucrative nature of investment banking business was hardly a secret on Wall Street or in the financial press, plaintiffs have painted a disturbing picture of the atmosphere at SSB that goes beyond SSB's direct disclosures about potential conflicts. These allegations, if true, make out a strong case that conflicts of interest at SSB, and the institutional policies that grew out of those conflicts, may have provided a motive for analysts to issue research reports that were more positive

than their truly held opinions would dictate. Nothing prevents plaintiffs from eventually introducing, at trial or in a summary judgment motion, evidence regarding these allegations to support an argument that the Level 3, XO, and Williams reports issued on or after April 18, 2001, were false.

However, without some particularized facts to indicate that, prior to April 18, 2001, Grubman held a private opinion different from his public opinions on Level 3, XO, or Williams, or even that the conflicts or institutional pressure described in the Complaints was targeted in some way at Grubman or his coverage prior to that date, these allegations are simply insufficient to state a claim for securities fraud. Grubman's Buy recommendations and target prices can't be characterized as false or misleading unless his actual opinion was otherwise, and merely alleging "undisclosed motivations" that *might* lead someone to misrepresent his true opinion does not suffice. *Merrill Lynch,* 273 F.Supp.2d at 372. Plaintiffs' conclusory assertions that Grubman did, in fact, misrepresent his true opinions prior to late April are likewise insufficient. *See, e.g., San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 813 (2d Cir.1996).[13]

b. *Reports issued on or after April 18, 2001*

■ However, for reports issued on or after April 18, 2001, plaintiffs have adequately alleged that Grubman misrepresented, at least in part, his true opinion about Level 3, XO, and Williams in his published research reports by continuing to rate each stock a "Buy" (for months, in the case of XO and Williams) although his private opinion did not support that recommendation. In an internal email on that date, Grubman specifically identified these three companies, among others, as stocks that must be downgraded, so that SSB retail customers would not continue to purchase additional shares of companies that were at risk of "go[ing] under." (*E.g.,* XO Complaint ¶ 83.) Subsequent internal emails support the allegation that Grubman did not believe in the Buy rating for these stocks after late April. (*Id.* ¶¶ 89–91.) Although the later emails might not be sufficient, standing alone, to support the claim for securities fraud based on misrepresentation of opinion, in combination with the April 18 email and the total mix of allegations, they lend further support to the charge that Grubman said "buy" when his actual opinion was otherwise.[14]

Of course, these charges are far from proven, and the effort to prove them will

---

**13.** The Level 3 Complaint also alleges that SSB's policies induced Grubman to issue "inflated recommendations" on other companies besides Level 3. (Level 3 Complaint ¶¶ 116–160.) As with the conflicts allegations generally, while these allegations may be relevant at some future point as evidence of a pattern or practice of behavior, in themselves they cannot satisfy the particularity requirements of Rule 9(b) and the PSLRA for fraud or false statement of opinion *as to Level 3 reports. See Podany,* 318 F.Supp.2d at 157–58.

**14.** Plaintiffs attempt to use Grubman's June 25 "Screw 'em" email to support a claim that Grubman believed certain stocks should have been rated "Sell" as early as June 2000. (*E.g.* Williams Complaint ¶ 2.) There is no support for this claim. The email, viewed in context, expresses frustration at the *contemporaneous* pressure Grubman was receiving not to reveal his opinion that certain stocks should be downgraded. However, the comment that "we should have put a sell on everything a year ago" is merely a hindsight observation that, without additional credible allegations, cannot support a claim that Buy or Overperform ratings in the previous year misstated Grubman's true opinion at the time they were issued.

be complicated by the fact that, although Grubman maintained the Buy rating for these stocks after late April, he drastically lowered the target price for each one: from $130 to $20 for Level 3, from $60 to $10 for XO, and from $70 to $15 for Williams. (Level 3 Complaint ¶ 80; XO Complaint ¶ 75; Williams Complaint ¶ 71.) Defendants argue in each instance that these lowered target prices and negative comments in the text somehow erase the alleged misrepresentation in the rating. (*E.g.,* Level 3 Mem. 25; XO Mem. 24–25; Williams Mem. 23–24.) However, in the context of Grubman's relentless cheerleading of these stocks over many previous months, the continued Buy rating is not insignificant, and if it falsely stated Grubman's true opinion as to the proper recommendation, plaintiffs have adequately alleged a material misrepresentation. The change in target prices, and Grubman's explanations of those changes in the text of the reports, merely create factual issues— possibly insurmountable factual issues—as to causation and reliance. Discovery may reveal additional facts regarding Grubman's drafting of these reports, and the evolution of his opinions, that will prevent plaintiffs from proving the other elements of their claims. However, plaintiffs need not establish at the pleading stage that their claims will ultimately prevail. To survive a motion to dismiss, they need only state a set of facts that, if true, would entitle them to relief. As to reports issued on or after April 18, 2001, plaintiffs have met that standard.

■■■ Finally, defendants argue that, even if the Buy rating on the reports issued on or after April 18 misstated Grubman's true opinion, the reports are protected by the "bespeaks caution" doctrine and are thus not actionable as securities fraud. (Level 3 Mem. 27–32; XO Mem. 28–31; Williams Mem. 26–31.) The "be-

speaks caution" doctrine limits fraud liability for forward-looking statements that, while positive, are coupled with sufficient "cautionary language or risk disclosures" that, taken in context, "bespeak caution" to the reader. *Spencer Trask Software v. RPost Int'l Ltd.,* 02 Civ. 1276(PKL), 2003 WL 169801, at *22 n. 16 (S.D.N.Y. Jan. 24, 2003). If clear cautionary statements and risk disclosures balance even materially misrepresented expressions of optimism or material omissions, such that "no reasonable investor could have been misled about the nature of the risk when he invested," *Halperin v. eBanker USA.com, Inc.,* 295 F.3d 352, 359 (2d Cir.2002), then the misstatements are not actionable, particularly where the cautionary language "expressly warn[s] of . . . the risk that brought about plaintiff's loss." *Id.* Defendants argue that this doctrine shields the reports at issue here because Grubman clearly disclosed the risks involved in investing in Level 3, XO, and Williams, and included cautionary language about the companies' debt levels, uncertain business prospects, and dependence on growth in their customer base.

■■■ However, this argument depends on a fundamental mischaracterization of plaintiffs' claims. Plaintiffs here do not claim that they suffered losses because Level 3 or XO or Williams ultimately declined in value or failed to secure the necessary funding or never experienced the expected growth in demand for broadband capacity. Plaintiffs allege that they suffered losses because Grubman's false statements of his opinion on the investment quality of these stocks artificially inflated their value. Thus the "risk" that would have to be "disclosed" or cautioned against in order for the post-April 18 reports to be non-actionable under *Halperin* is the risk that Grubman's Buy recommendation was not true. Nothing in the reports indicates that Grubman or SSB

might not truly believe that suitably risk-seeking investors should buy Level 3, XO, or Williams. Indeed, the very cautionary language that defendants cite in the late reports may actually serve to highlight and emphasize the Buy rating, rather than balance or dilute it. Grubman is essentially saying "the target price must be lowered, and there are all these risks, but even with those negatives, I still believe certain investors should buy this stock, just as I did in rosier times." *See, e.g., Demarco v. Lehman Bros.*, 309 F.Supp.2d at 635. Under these circumstances, if Grubman's Buy ratings were knowingly false, those statements are not protected by the bespeaks caution doctrine.

Defendants' citation to the language of the PSLRA does not alter this conclusion. Defendants emphasize on reply that Congress protected forward-looking statements if the statements were not knowingly false when made *or* if "they are accompanied by meaningful cautionary language." 15 U.S.C. § 78u–5(c)(1). (Level 3 Reply at 10 n. 9.) Defendants assert that this language renders the speaker's state of mind irrelevant, citing *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir.1999). Even if defendants' interpretation is correct, the cautionary language they point to is not "meaningful" in the face of deliberately false Buy recommendations, for the reasons discussed above. *See In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F.Supp. 68, 72 (S.D.N.Y.1996) (the "doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.")

### 2. Causation

 In order to state a claim under section 10(b), in addition to adequately

pleading falsity and scienter, the complaint must adequately allege that "plaintiff's reliance on defendant's action caused plaintiff injury." *Press v. Chem. Invest. Services Corp.*, 166 F.3d 529, 534 (2d Cir.1999) (internal quotations omitted). This causation requirement has two elements: "a plaintiff must allege both transaction causation, *i.e.*, that *but for* the fraudulent statement or omission, the plaintiff would not have entered into the transaction; and loss causation, *i.e.*, that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 95 (2d Cir.2001) (emphasis in original).

In these three cases, the sole causation argument that defendants have raised in their motions to dismiss is that the Complaints do not adequately allege loss causation as to the so-called Conflicts Misrepresentations (as distinct from the allegations that the rating and target prices in the research reports were false statements of opinion, which defendants call the Level 3 Misrepresentations, the XO Misrepresentations, and the Williams Misrepresentations). This argument is moot, as the only alleged misrepresentations that can possibly support a claim of securities fraud are those made about the specific securities in reports issued on or after April 18, 2001. The allegations about conflicts of interest at SSB or institutional pressures on research analysts are relevant because they provide additional evidence of the motivation for the alleged false statements of opinion; they are not actionable on their own.

### III. Statute of Limitations

Similarly, defendants argue in their briefing on the motions to dismiss that plaintiffs' claims are time-barred because

they were on notice of the facts underlying the Conflicts Misrepresentations before any applicable limitations period. However, the only claims that will survive defendants' motions are claims based on allegations that defendants misstated their true opinions on Level 3, XO, and Williams, in reports issued on or after April 18, 2001. As fully discussed in the Court's opinion in the related case of *In re Salomon Analyst AT&T Litigation,* plaintiffs could not have been on notice of the elements of this particular fraud until at least August 2002, when the investigation of New York Attorney General Eliot Spitzer was revealed, both in news articles and through the filing of a civil complaint. As the initial complaints in these actions were filed within weeks or months of these revelations, they are well within any applicable statute of limitations. *See In re Salomon Analyst AT&T Litigation,* 350 F.Supp.2d 455, 2004 WL 2757398 (S.D.N.Y.2004).

IV. *Standing*

■ Each of the three Complaints describes a proposed class of purchasers of the "securities" of Level 3, XO, and Williams. In addition, the Williams Complaint describes a sub-class of plaintiffs who purchased Williams securities through GPM accounts as retail brokerage customers of SSB, and brings several additional claims solely on behalf of this subclass. Defendants have moved to dismiss any claims brought on behalf of bondholders, as distinct from shareholders, and any claims brought on behalf of GPM accountholders, on the grounds that the named plaintiffs lack standing to assert claims on behalf of these groups of plaintiffs. Plaintiffs have attempted to deflect these arguments primarily by pointing out that nothing in the PSLRA requires that lead plaintiffs have standing to bring all claims

in the litigation. This retort misses the point entirely. While plaintiffs are correct that *lead* plaintiffs, appointed pursuant to the PSLRA, need not satisfy all elements of standing with respect to the entire lawsuit, the selection of lead plaintiffs does not remove the basic requirement that at least one *named* plaintiff must have standing to pursue each claim alleged. *See In re Global Crossing Securities Litigation.* 313 F.Supp.2d 189, 205 (S.D.N.Y.2003) ("Lead Plaintiffs have a responsibility to identify and include named plaintiffs who have standing to represent the various potential subclasses of plaintiff who may be determined ... to have distinct interests or claims."); *WorldCom,* 294 F.Supp.2d at 422; *In re IPO Securities Litigation,* 214 F.R.D. 117, 122–23 (S.D.N.Y.2002). *See also Lewis v. Casey,* 518 U.S. 343, 358 n. 6, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (plaintiffs with one sort of injury lack standing to challenge a different, though perhaps related, injury, because "standing is not dispensed in gross"); *Griffin v. Dugger,* 823 F.2d 1476, 1483 (11th Cir. 1987) ("a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.").

■ The GPM claims (Counts III, IV, and V) in the Williams Complaint present the clearest violation of this basic rule. These Counts allege wholly different claims (breach of contract, breach of fiduciary duty, and violation of the Investment Advisors Act) that rest on wholly different legal theories, and the Williams Complaint identifies no named plaintiff who held a GPM account, much less purchased Williams securities through such an account. Those claims must be dismissed for lack of standing.[15]

---

15. Defendants also move to dismiss the GPM claims on substantive grounds. (Williams

The inclusion of bondholders is slightly more complicated, although the result must ultimately be the same. The claims *are* based on some of the same factual allegations and legal theories, at least as to falsity and scienter. However, in a case alleging fraud perpetrated by means of false statements made by an equity analyst about the investment quality of a company's equity securities, especially where the allegedly false statements are specifically directed to the value and prospects of the equity securities (*e.g.,* Buy ratings and target stock prices), and the legal theory underlying the claims is supported, as to causation and reliance, primarily by allegations about the defendant analyst's influence on equity markets and the price of equity securities, the injury claimed to bondholders, if cognizable at all, seems fundamentally different than the injury claimed to equity security holders.

The XO Plaintiffs have cited a handful of cases in which, at the class certification stage, some courts found that named plaintiffs who had purchased only some of the securities at issue could satisfy the requirements of Rule 23 to represent a class composed of purchasers of several types of securities. (XO Opp. Mem. 36–37.) The Court is unpersuaded by these cases. None address the issue of standing, and each recognized the substantial number of cases that have concluded otherwise, yet determined that under the specific circumstances of the case before them, a particular plaintiff could be deemed "adequate" under Rule 23. *See, e.g., Endo v. Albertine,* 147 F.R.D. 164, 167 (N.D.Ill.1993) (cited in XO Opp. Mem. at 37.) Under the circumstances of *these* cases, however, and given the law on standing in this district,

named plaintiffs who have only alleged injury on the basis of their equity purchases lack standing to pursue a claim that the alleged misrepresentations caused injuries by artificially inflating the prices of certain bonds, where none of the named plaintiffs purchased those bonds.

Accordingly, as to Level 3, the claims on behalf of bondholders must be dismissed because no named plaintiff is alleged to have purchased any Level 3 bonds after April 18, 2001.[16] As to XO, the same result must obtain, since no named plaintiff purchased any XO bonds. Finally, as to Williams, plaintiffs have named a plaintiff, Clarence Bevington, who purchased a certain class of Williams bonds, and purchased those bonds after April 18, 2001. (Williams Rosen Decl., Ex. 26.) Defendants' primary argument here appears to be that Bevington is not an "adequate" plaintiff for all bondholders, since he only purchased one class of the apparently numerous outstanding classes of Williams debt securities. (Williams Mem. 45.) But such concerns are properly raised at the class certification stage. Defendants have not identified any way in which Bevington's injury is substantively different from the injury suffered by holders of other classes of debt securities, and none is apparent to the Court. Without reaching the question of adequacy as a class representative, Bevington satisfies the minimum threshold for standing to bring claims on behalf of purchasers of Williams' debt securities.

## CONCLUSION

Plaintiffs have adequately pled falsity and scienter with respect to the Level 3,

---

Mem. 45–49.) Because the claims are dismissed for lack of standing, the Court need not reach these arguments.

**16.** Plaintiff Charles Fuller purchased some Level 3 bonds, but all in 2000, before the date of any of the allegedly false statements that will survive defendants' motion. (Level 3 Rosen Decl., Ex. 17.)

XO, and Williams research reports issued by Grubman and SSB on or after April 18, 2001. Claims based on any prior statements, or on allegations that Grubman and SSB failed to adequately disclose conflicts of interest between research and banking, are dismissed for failure to plead fraud with particularity pursuant to Rule 9(b) and failure to state a claim on which relief can be granted. Counts III, IV, and V in the Williams Complaint are dismissed on the ground that plaintiffs lack standing. Likewise, any claims in the Level 3 Complaint and XO Complaint that purport to be brought on behalf of purchasers of debt securities are dismissed for lack of standing. Counsel are directed to appear before the Court for a conference to set a discovery schedule on December 17, 2004, at 10:00 a.m.

SO ORDERED.