### In re SALOMON ANALYST METROMEDIA LITIGATION

No. 02 Civ.7966 (GEL).

United States District Court, S.D. New York.

Jan. 5, 2005.

Frederic S. Fox, Donald R. Hall, Kaplan Fox & Kilsheimer LLP, New York City, Richard A. Adams, George L. McWilliams, Patton, Haltom, Roberts, McWilliams & Greer, LLP, Texarkana, TX, Bradley E. Beckworth, Jeffrey Angelovich, Cary Patterson, Nix, Patterson & Roach, LLP, Daingerfield, TX, for Lead Plaintiffs Frank Russo, Jr., the Vicari Family, the Franco Family, Peter Carolan, and Techgains Corporation.

Robert B. McCaw, Peter K. Vigeland, Christopher J. Meade, Wilmer, Cutler & Pickering, New York City, for Defendants Citigroup Inc., Citigroup Global Markets Inc. (f/k/a Salomon Smith Barney Inc.), Citicorp USA, Inc., and Jack Grubman.

## OPINION AND ORDER

LYNCH, District Judge.

This case concerns allegations that the defendant bank Citigroup, Inc. ("Citi-

group"), its divisions Citicorp USA and Salomon Smith Barney ("SSB"), and its research analyst Jack Grubman engaged in a scheme to defraud purchasers and sellers of stock in Metromedia Fiber Network, Inc. ("Metromedia") and to enrich themselves, by issuing and disseminating research analyst reports on Metromedia that were materially false and misleading. The purpose and motivation for the allegedly false and misleading reports was to garner lucrative investment banking business for the investment banking division of SSB, which would then increase Grubman's personal compensation. Defendants have moved to dismiss the Complaint for failure to state a claim on which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b), and, as to certain claims, for lack of standing. As discussed below, the motion will be granted in part and denied in part.

In addition to its voluminous factual allegations about SSB and Grubman and their research coverage of Metromedia, the Complaint describes a proposed class of all purchasers of Metromedia securities from November 25, 1997, through July 25, 2001, and brings the following claims: (1) against all defendants for violations of section 10(b) and Rule 10b–5; (2) against SSB, Citicorp USA, and Citigroup for violations of section 20(a) as "control persons" of Grubman; and (3) three additional counts brought on behalf of a sub-class of persons who purchased Metromedia securities through SSB's Guided Portfolio Management ("GPM") accounts. In their motion to dismiss, defendants argue that all of these claims must fail because plaintiffs have failed to allege with particularity that the Metromedia research reports were false or misleading (D.Mem.14–25), the projections and recommendations in the Metromedia reports are protected by the "bespeaks caution" doctrine

(D.Mem.26–29), plaintiffs have failed to allege loss causation with respect to what defendants call the "conflicts omissions" (D.Mem.29–32), most of plaintiffs' claims are time-barred (D.Mem.32–43), and plaintiffs lack standing to bring claims on behalf of bond purchasers or GPM accountholders (D.Mem.44–46).

This case is substantially similar to the cases brought as *In re Salomon Analyst Level 3 Litigation, In re Salomon Analyst XO Litigation,* and *In re Salomon Analyst Williams Litigation,* which the Court dismissed in part in an Opinion and Order dated December 2, 2004. *See In re Salomon Analyst Level 3 Litigation,* 02 Civ. 6919(GEL), 2004 WL 2757397 (S.D.N.Y. Dec. 2, 2004). The plaintiffs bring substantially the same claims as the plaintiffs in those cases, and defendants raise substantially the same arguments in support of their motion to dismiss. Accordingly, the full exposition of the common factual allegations and the legal standards governing defendants' arguments for dismissal will not be repeated here; the reader is referred to the *Level 3* opinion for a complete treatment of these issues. 350 F.Supp.2d at 481–83, 487–97. This opinion will simply address in summary form the critical issues governing this case.

First, defendants are correct that these plaintiffs lack standing to bring claims on behalf of purchasers of Metromedia debt securities (as opposed to equity securities), and to bring Counts III, IV, and V on behalf of a sub-class of GPM accountholders, because the Complaint identifies no named plaintiff with standing to bring these claims. *Id.* at 495–97. Standing is not "dispensed in gross," even through the class action vehicle, *Lewis v. Casey,* 518 U.S. 343, 358 n. 6, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), and the hypothetical alleged injury to Metromedia bondholders, as well as the wholly different claims and legal theories alleged for

GPM accountholders, are sufficiently dissimilar to the claims of the named plaintiffs to warrant dismissal for lack of standing.

■ Second, as with the pre-April 18, 2001, reports on Level 3, XO, and Williams, any securities fraud claims based on the Metromedia reports issued prior to March 8, 2001, must be dismissed for failure to plead fraud with particularity. *See* 350 F.Supp.2d at 490–92. Each of these reports is clearly labeled "Speculative," and each reveals Grubman's consistent view that Metromedia, like other similarly situated telecom companies, was poised for explosive growth and profitability as the money invested in fiber-optic infrastructure fueled a parallel expansion of demand for broadband communications. (*E.g.* Vigeland Decl. Ex. 1) (Jan. 7, 1998 Metromedia Report); Ex. 15 (Aug. 2, 1999 Metromedia Report.) Although plainly very bullish on Metromedia, the reports also include discussion of the specific risks the company faced in executing its business plan—in particular, its heavy losses related to infrastructure costs and its need for continued access to additional funding to complete the planned build-out of its network. (*See, e.g.,* Vigeland Decl. Ex. 11 (May 12, 1999 Metromedia Report).) As with other stocks he covered, Grubman supported his Metromedia recommendations, in part, with a discounted cash flow ("DCF") analysis. While plaintiffs assert that these models were false and misleading (*e.g.* Compl. ¶ 67(d)), the reports themselves clearly disclose the models used as well as the assumptions underlying their construction, including the estimated growth rate and discount rate. (*See, e.g.,* Vigeland Decl. Ex. 4 (Aug. 11, 1998 Metromedia Report); Ex. 25 (Oct. 10, 2000 Metromedia Report).) Grubman also explained his reasons for employing these

assumptions in the reports. These assumptions, while perhaps aggressive, are consistent with Grubman's general view as to the prospects and condition of both Metromedia and the telecom industry as a whole. In short, plaintiffs plead no specific facts or allegations, beyond conclusory assertions, that would indicate that Grubman's pre-March 8, 2001, Metromedia reports did not present his actual opinion as to the future prospects and investment quality of Metromedia equity securities.

As with the nearly verbatim allegations in the Level 3, XO, and Williams Complaints, plaintiffs' voluminous and repetitive cataloguing of the conflicts and institutional pressures at SSB related to the relationship between investment banking and research cannot save their inadequately pleaded allegations about Grubman's pre-March 8, 2001, Metromedia reports. *See* 350 F.Supp.2d at 492. While these allegations may suggest a motive for SSB's issuance of false or misleading reports on Metromedia, by themselves they are simply insufficient to state a claim for securities fraud. *Id.* (citing *Podany v. Robertson Stephens,* 318 F.Supp.2d 146, 156 (S.D.N.Y.2004); *In re Merrill Lynch & Co. Research Reports Securities Litigation,* 273 F.Supp.2d 351, 373 (S.D.N.Y.2003)).

■ The specific allegations in the Metromedia Complaint as to the relationship between SSB and Metromedia's CEO, Stephen Garofalo, do not alter this conclusion. Plaintiffs allege that, as part of a coordinated program to secure additional investment banking business from Metromedia, SSB extended millions of dollars in margin credit to Garofalo and also allocated shares in "hot" IPOs to Garofalo as part of a program that rewarded (or, in plaintiffs' words, "bribed") the officers and directors of companies that gave investment banking business to SSB.[1] (Compl.¶¶ 165–183.)

---

1. The Court expresses no view as to the legality or propriety of these practices, many of

which are the subject of consolidated litiga-

Plaintiffs claim that these alleged facts should have been disclosed to investors by SSB (*id.* ¶ 183), but they make no effort to explain how the failure to disclose these alleged facts rendered Grubman's Metromedia reports false and misleading. Indeed, plaintiffs' theory, to the extent it can be teased out of the Complaint, does not make logical sense—if anything, the events and activities described would render Garofalo beholden to SSB, rather than providing a motive for SSB or Grubman to curry additional favor with Garofalo by issuing false and misleading research reports on his company, as plaintiffs allege. In any event, these allegations do not alter the conclusion that plaintiffs have failed to adequately plead falsity and scienter as to Metromedia reports issued prior to March 8, 2001, and thus claims based on those reports must be dismissed. Accordingly, defendants' argument that the so-called "Conflicts Omissions" cannot satisfy the requirement to plead loss causation is moot, as those allegations alone cannot support a securities fraud claim in any event. *See Level 3,* at 492, 495.

 The one significant divergence between the Metromedia Complaint and those in *Level 3, XO,* and *Williams* is the former's allegations that Grubman's reports from December 2000 through July 25, 2001, were materially false and misleading because of their omission or misstatement of material facts regarding a credit facility that Citicorp USA was to provide to Metromedia. (Compl.¶¶ 78–143.) Metromedia and Citicorp USA signed a commitment letter for a $350 million credit facility in December 2000; the facility was to be underwritten by Citicorp USA, which committed to providing $75 million of the credit and syndicating the remainder of the facility to other lenders, subject to certain conditions. (*Id.* ¶ 82.) As alleged by plaintiffs, and not

seriously contested by defendants, the proposed facility suffered numerous problems and delays over the next seven months, ultimately evolving into a significantly different financing package sometime after the end of the class period here.

However, beginning with a report on March 8, 2001, through a report issued June 6, 2001, Grubman's Metromedia reports simply noted as a positive development that the company had "obtained a commitment for a fully underwritten credit facility for $350 million from Citicorp USA, Inc., which it expects will fully fund its current business plan." (*E.g.,* Vigeland Decl. Ex. 28 (March 8, 2001 Metromedia Report).) The June 28 Report introduces some doubt about the facility ("As [Metromedia] is approaching its extended deadline for closing its $350 million bank debt facility and has not yet closed the deal, we assume that there is a problem with the loan . . . ."), and the July 25 Report finally downgrades Metromedia to "Neutral" due, in part, to the continued delays in closing the $350 million facility and the lack of "visibility" on the company's financing. (Vigeland Decl. Exs. 32, 34.)

The Metromedia Complaint contains 23 pages of allegations about the credit facility and the problems and delays associated with it. (Compl.¶¶ 78–153.) Nearly all of these allegations relate to the opinions, conclusions, or knowledge of the investment bankers at SSB who were working on the credit facility, and defendants correctly point out that there is little, beyond conclusory assertions, to tie Grubman to this information or impute the knowledge of the investment bankers to Grubman, particularly given that SSB's stated internal policies created a "Chinese Wall" to shield equity analysts from the non-public information held by investment bankers.

tion currently pending before Judge Scheind-

lin in this Court.

(D.Mem.23–25.) However, notwithstanding the many dubious leaps of logic made by plaintiffs in their Complaint, the Court cannot agree with defendants that claims based on reports issued from March 8, 2001, through July 25, 2001, must be dismissed.

On January 9, 2001, Metromedia announced that it had signed the commitment letter with Citicorp USA. (Compl.¶ 91.) In his next report, and for the next three months, as the situation regarding the credit facility deteriorated sharply, Grubman simply parroted the company's announcement in his reports. Despite SSB's written "Chinese Wall" policies, the Complaint contains sufficient concrete allegations to support an inference that Grubman breached the "wall" on numerous occasions, with the apparent knowledge and support of SSB management. The Complaint alleges numerous examples of Grubman's involvement in the Metromedia credit facility—encouraging SSB to extend the facility, meeting with company management to discuss the facility, contacting the CEO of SSB to discuss its progress, and getting in a "tiff" with the bankers handling the loan as it failed to close on time. (*See, e.g., id.* ¶¶ 99, 105, 135.) Most damning, an internal assessment of the Metromedia reports by SSB research management after the July 25 downgrade indicates that clear statements of Citicorp USA's role in the funding and the risks and restrictions associated with securing the financing were improperly omitted from the Spring 2001 reports and "should have been [disclosed] since they were material risks to the company obtaining the funding it needed." (Vigeland Decl. Ex. 52 (August 10, 2001, Tucker email).) The factual allegations in the Complaint, which must be taken as true for purposes of this motion, would permit a reasonable factfinder to conclude that Grubman was aware of the true facts regarding the deterioration of Metromedia's financing in the spring of 2001 and failed to disclose those facts in his reports.

Thus, plaintiffs have satisfied the threshold requirement that they plead material misstatements or omissions with particularity as to the statements about the Citicorp USA credit facility and Metromedia's funding position in reports issued between March 8, 2001, and July 25, 2001. Because defendants chose to provide *some* information about the credit facility, plaintiffs have adequately pled that, particularly in the context of Grubman's previous emphasis on the importance of funding to the future prospects of emerging telecom companies, including Metromedia, Grubman's alleged failure to disclose the restrictions and risks related to the credit facility rendered his reports from March 8, 2001, to July 25, 2001, materially misleading and thus actionable under section 10(b) and Rule 10b–5.

Finally, the claims that survive defendants' motion were timely filed, under any applicable statute of limitations. Defendants argue that plaintiffs' "conflicts omissions" claims are time-barred because they should have been on notice of those claims no later than July 2001. However, the "conflicts omissions" claims will not survive in any event. As with the surviving claims in *Level 3, XO,* and *Williams,* plaintiffs could not have reasonably been on notice of these claims prior to the publication of the results of various government investigations into SSB and Grubman in the summer of 2002. *See* 350 F.Supp.2d at 495. As the first complaint in this action was filed on October 7, 2002, the claims were timely filed.

## CONCLUSION

Plaintiffs have adequately alleged falsity and scienter as to reports issued by defendants on Metromedia between March 8, 2001, and July 25, 2001. However, they

have failed to meet this standard as to statements made prior to March 8, 2001, and accordingly, all claims based on those statements are dismissed. In addition, any claims purported to be brought on behalf of bondholders or GPM account-holders (including Counts III, IV and V in their entirety) are dismissed for lack of standing.

Counsel are directed to appear before the Court for a conference to set a discovery schedule on January 14, 2005, at 3 p.m. SO ORDERED.