## In re SALOMON ANALYST WINSTAR LITIGATION

### No. 02 Civ.6171(GEL).

United States District Court, S.D. New York.

Jan. 5, 2005.

Ralph M. Stone, James P. Bonner, Patrick L. Rocco, Thomas G. Ciarlone, Jr., Shalov Stone & Bonner LLP, New York City, Lead Counsel and Attorneys for Lead Plaintiffs Robert Ahearn, Banca Intermobiliare di Investimenti e Gestioni SGR, DRYE Custom Pallets, Almar Sales Company and Raymond Ashkenazie.

Martin London, Richard A. Rosen, Brad S. Karp, Eric S. Goldstein, Joyce S. Huang, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York City, Peter K. Vigeland, Wilmer, Cutler & Pickering, New York City, for defendants Salomon Smith Barney, Inc., Jack Grubman, Christine Gochuico, Kevin McCaffrey, and Robert Waldman.

## OPINION AND ORDER

LYNCH, District Judge.

This case concerns allegations that the defendant Salomon Smith Barney ("SSB"), its research analysts Jack Grubman and Christine Gochuico, its bond analyst Robert Waldman, and its chief of domestic equity research Kevin McCaffrey engaged in scheme to defraud purchasers and sellers of stock in Winstar Communications, Inc. ("Winstar"), and to enrich themselves, by issuing and disseminating research analyst reports on Winstar that were materially false and misleading. The purpose and motivation for the allegedly false and misleading reports was to garner lucrative investment banking business from Winstar for the investment banking division of SSB, which would also increase the personal compensation of both Grubman and Gochuico, and to shore up the financial profile of Winstar to increase the likelihood that Winstar could repay its substantial debt to SSB's sister corporation, Citicorp. Defendants have moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief can be granted, and for failure to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b). Because plaintiffs' claims are time-barred under the applicable statute of limitations, the motion will be granted.

During the time covered by the Complaint, defendant Salomon Smith Barney ("SSB"), a division of Citigroup, was one of the world's leading financial services firms, providing investment banking services to businesses, retail brokerage services to both individuals and institutional investors, and research reports and ratings on publicly-traded securities. Defendant Jack Grubman was a Managing Director at SSB and was considered its leading telecommunications industry analyst; Grubman resigned from SSB by mutual agreement in 2002. Defendant Christine Gochuico was a vice-president in SSB's research division and worked under Grubman as a telecom analyst. Defendant Robert Waldman was, like Grubman, a Managing Director, but in SSB's corporate bond research division. Defendant Kevin McCaffrey was the head of SSB's domestic equity research group, and was Grubman's direct supervisor during the relevant period. (Consolidated Amended Complaint ¶¶ 13–17.)

Winstar was a broadband telecommunications provider in the competitive local exchange carrier (or "CLEC") indus-

try, competing primarily with so-called "Baby Bells" like BellSouth and Verizon. Winstar built a network of "fixed wireless" resources, using dish antennas mounted primarily on office buildings around the country to provide its mostly corporate customers with a variety of telecommunications services, including web hosting, high-speed data transmission, and local and long-distance telephone service. Expansion of Winstar's fixed wireless network was capital-intensive, requiring frequent infusions of cash from equity investors or debt offerings. (*Id.* ¶¶ 23–25.) Grubman began covering Winstar's publicly-traded stock in January 1998, issuing a report with a "Buy" rating and a 12–18 month price target of $71 per share. (*Id.* ¶ 29.) Between January 1998 and April 2001, Grubman issued a number of consistently positive research reports on Winstar, all rating the stock a "Buy." (*Id.* ¶ 30.)

Winstar had never been profitable, but in the spring of 2001, the company began a steep financial decline. On April 2, Winstar announced that it would delay filing its 10–K due to "uncertainty" about a number of material transactions. (*Id.* ¶ 77.) On April 5, Winstar announced that it was halting its expansion plans and laying off about 2,000 employees—approximately fifty percent of its workforce. (*Id.* ¶ 83.) On April 16, Winstar announced that it had failed to make a $75 million interest payment on its senior debt facility and that Lucent, one of Winstar's primary lenders, had subsequently declared Winstar in default of its credit facility. Winstar also disclosed that it had hired the Blackstone Group to advise it on restructuring alternatives, including a possible bankruptcy filing. (*Id.* ¶ 87.) On April 17, Grubman downgraded Winstar three steps on the SSB rating scale, to "underperform," and indefinitely suspended his target price for the stock, noting in his report that "we were wrong on this stock." (*Id.* ¶ 88.)

Winstar filed for bankruptcy protection the following day, and Grubman discontinued his coverage of the company on April 27, citing Winstar's delisting from the NASDAQ. (*Id.* ¶ 94.)

In addition to its eighty-plus pages of factual allegations regarding conflicts of interest at SSB and Grubman and Gochuico's research coverage of Winstar, the Complaint describes a purported class of all persons who purchased or otherwise acquired Winstar securities between December 16, 1999, and April 17, 2001, and brings the following claims: (1) against all defendants for violations of section 10(b) and Rule 10b–5(b) for material misstatements and omissions in the Winstar research reports; (2) against all defendants for violations of section 10(b) and Rule 10b–5(a) and (c) for engaging in a "plan, scheme and course of conduct" to artificially inflate the price of Winstar securities; (3) against all defendants for violations of sections 9(a), 9(e) and 10(b) of the Exchange Act for a "continuous course of manipulative conduct to artificially raise and maintain the market prices of Winstar securities"; and (4) against SSB, Grubman, and McCaffrey for violations of section 20(a) as "control persons" of, variously, Grubman, Gochuico, McCaffrey, and Waldman. In their motion to dismiss, defendants argue that these claims must fail because plaintiffs have failed to allege their claims of fraud with the particularity required by Rule 9(b) (D.Mem.18–33), the reports alleged to be misleading are protected by the "bespeaks caution" doctrine (D.Mem.34–40), plaintiffs have failed to allege loss causation with respect to what defendants call the "Conflicts Misrepresentations" (D.Mem.40–45), plaintiffs have failed to properly allege manipulation with regard to Counts II and III (D.Mem.45–49), and all of the claims are time-barred (D.Mem.11–17.)

This case is substantially similar to the related cases of *In re Salomon Analyst Level 3 Litigation, In re Salomon Analyst XO Litigation*, and *In re Salomon Analyst Williams Litigation*, which the Court dismissed in part in an Opinion and Order dated December 2, 2004. *See In re Salomon Analyst Level 3 Litigation*, 350 F.Supp.2d 477 (S.D.N.Y.2004). With the exception of their manipulation claims, plaintiffs here bring substantially the same claims as the Level 3, XO and Williams plaintiffs, based upon largely overlapping factual allegations, and defendants raise substantially the arguments in support of their motion to dismiss. Accordingly, the Court will rely on the description of the common factual allegations and the exposition of the legal standards governing many of defendants' arguments for dismissal contained in the *Level 3* opinion, and the reader is referred thereto. 350 F.Supp.2d at 481–83, 487–497. This opinion will simply address in summary form the critical issues governing this case.

The primary difference between the Winstar Complaint and those in *Level 3, XO*, and *Williams* is that plaintiffs here have offered no Winstar-specific allegations to support the claim that Grubman's research reports misstated his truly-held opinion. In the latter three cases, plaintiffs made specific allegations that, at least as to statements made after April 18, 2001, Grubman's public statements about the investment quality of Level 3, XO and Williams were at odds with his privately-held views. *Id.* at 492. In contrast, plaintiffs here offer little but conclusory asser-

tions of falsehood to support their claim that Grubman affirmatively lied about his true opinion on Winstar in his published reports on the company.[1] Rather, the fraud alleged here is that, whether through deliberate omission or reckless disregard for the truth, the research reports on Winstar "failed to disclose that Winstar was at all relevant times in a precarious financial condition and would be unable to survive unless it continued to increase its debt load or otherwise urgently secure massive financing." (Compl.¶ 7.) This basic allegation is elaborated and repeated throughout the Complaint, identifying each report issued by defendants and alleging that each omits or irrationally minimizes certain "facts" such as: Winstar's steady increase in borrowing and "potentially crushing" levels of debt; Winstar's continued losses and negative cash flow; Winstar's dependence on significant additional capital infusions from debt or equity to realize its business plan; Winstar's uncertain odds of obtaining that additional financing; and Winstar's special susceptibility to insolvency. (*E.g., id.* ¶¶ 32, 39, 41, 45, 47, 49.) Plaintiffs allege that the reports on Winstar that did not disclose these alleged facts, or that made statements to the contrary (such as that the company was "fully funded" through a certain date, or that the company had reliable financing from Lucent), thus lacked any reasonable basis in fact and were issued in bad faith as part of a manipulative scheme to artificially inflate the price of Winstar securities.

---

**1.** Plaintiffs do make some allegations that, very late in the class period, Gochuico, Grubman's junior analyst and the secondary author of many of the Winstar reports, privately held and expressed opinions about Winstar that were at odds with the public statements made in the reports. (*See, e.g.* Compl. ¶¶ 35(ii), 143–146.) These statements by Gochuico, however, at best support an allegation

that she did not privately believe the "target price" for Winstar should have remained at $50 as late as February 2001. In contrast to plaintiffs' characterizations, most of the emails actually support the view that Gochuico truly believed that Winstar was a good buy at current prices, and that, although plainly labeled "speculative," the stock was a profit opportunity for high-risk investors.

■ Assuming for the moment that these allegations could satisfy the Rule 9(b) requirements that fraud be pled with particularity, plaintiffs' claims nonetheless must fail because plaintiffs were on inquiry notice of these claims by April 18, 2001, and the claims are thus time-barred under the applicable one-year statute of limitations. The Second Circuit recently summarized the law governing the "inquiry notice" standard for securities fraud cases:

The one-year limitations period begins to run after the plaintiff "obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1042 (2d Cir.1992). Furthermore, "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises." *Dodds v. Cigna Secs., Inc.*, 12 F.3d 346, 350 (2d Cir.1993). The circumstances that give rise to a duty of inquiry are often referred to as "storm warnings." *Id.* Once a plaintiff receives these "storm warnings" and a duty of inquiry arises, "knowledge will be imputed to the investor who does not make such an inquiry." *Id.*

*Levitt v. Bear, Stearns & Co.*, 340 F.3d 94, 101 (2d Cir.2003); *see also LC Capital Partners LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 154 (2d Cir.2003). To constitute "storm warnings," the information "must be such that it relates directly to the misrepresentations and omissions the Plaintiffs later allege in their action against the defendants." *Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 193 (2d Cir.2003). While the wrongdoing indicated by the storm warnings must be *probable* and not merely *possible*, an investor does not "have to have notice of the entire fraud being perpetrated to be on inquiry notice." *Dodds*, 12 F.3d at 351–52. Although courts should exercise caution in resolving questions of notice at the pleading stage, the question of when a plaintiff was on inquiry notice of a claim is an objective determination and, where the facts needed can be gleaned from the complaint, papers integral to the complaint, and publicly disclosed documents, "resolution of the issue on a motion to dismiss is appropriate" and has been done in the Second Circuit "in a vast number of cases." *LC Capital*, 318 F.3d at 156; *see also Newman*, 335 F.3d at 193.

■ Plaintiffs here plainly were on inquiry notice of their claims no later than April 18, 2001, when Winstar announced it had filed for bankruptcy protection. As discussed above, the core of plaintiffs' fraud claim is that defendants failed to disclose, irrationally minimized, or outright denied with no reasonable basis in fact, Winstar's "precarious financial condition," its dependence on significant external financing for survival and the uncertainty of that financing, its deteriorating credit position, and its high risk of bankruptcy, all the while touting their expertise and insider access to the company. Yet the Complaint on its face reveals a steady drumbeat of "storm warnings" about these very allegations: On January 8, 2001, an analyst at CIBC downgraded Winstar to a "hold" because of Winstar's "spiraling debt" and "startling" levels of interest payments. (Compl.¶ 55.) On January 25, 2001, an analyst from Kaufman Brothers L.P. stated that Winstar "may be poised to announce a difficult December and revised 2001 guidance," may restructure its operations, and "may not be as well-funded as many believe"—statements that Grubman quickly denounced as "irresponsible" and "unfounded," citing his direct conversations with contacts at the company. (*Id.* ¶ 56.) On February 23, 2001, Grubman issued a report that maintained the "buy" rating and $50 target price (although

Winstar was then trading around $10), specifically stated that Winstar was operating "well within its means" and had ample available credit and vendor financing, and closed by noting that "[w]e believe that recurring general concerns that [Winstar] faces cash constraints are misplaced." (*Id.* ¶ 58.) On February 27, 2001, Grubman issued a report declaring "there will be no issue" with Winstar's ability to obtain needed external financing over the upcoming year or so. (*Id.* ¶ 62.)

On March 8, 2001, an analyst at Asensio & Company issued a damning report on Winstar, identifying each of the problems that plaintiffs claim were fraudulently omitted or misrepresented in the SSB reports, including that Winstar's value "is substantially and irreparably lower than the amount it owes ... we believe Winstar's large operating losses, already troubled debt and 'toxic' preferreds materially impaired, if not entirely eliminated, its ability to obtain funding.... [Winstar's bank and bond] debts alone are problematic.... [Winstar's bonds'] distressed prices imply serious default concerns.... We believe Winstar will have to be restructured to have any chance of funding its continuing operating losses, and make required capital and repair expenditures. As a result, we see no likely outcome that can provide Winstar's common shareholders with any value." (*Id.* ¶¶ 65–67.) As he had done with other critical analyst reports, Grubman issued a report the next day specifically rejecting Asensio's analysis, insisting that the analyst's concerns "are misplaced and ... certain information [is] either incomplete, inaccurate or inconsistent with our analysis. It is evident that the [analyst] lacks an understanding of the CLEC industry." The report went on to rebut specific points from the Asensio report as "misguided." (*Id.* ¶¶ 68–69.)

On March 19, 2001, Asensio issued another report on Winstar, suggesting that "a collapse in the price of Winstar's senior notes raised questions about both its accounting practices and its ability to service its debt." (*Id.* ¶ 76.) On April 2, 2001, Winstar announced it would delay filing its 10–K due to "uncertainty" about the consummation of certain material transactions; its stock closed that day at less than a dollar per share. (*Id.* ¶ 77.) Three days later, the company announced it was halting expansion plans and laying off half of its workforce—approximately 2,000 employees. (*Id.* ¶ 83.) On April 6, 2001, the Wall Street Journal reported that the massive workforce reductions were occasioned by Winstar's failure to make "hundreds of millions of dollars in asset sales during the first quarter of 2001." (*Id.* ¶ 114.) On April 16, 2001, Winstar announced that it had failed to make a $75 million interest payment on its senior bank debt, and that Lucent had thus declared Winstar in default of its credit facility, effectively shutting off further drawdowns from the credit line. Winstar revealed that it had hired the Blackstone Group, a well-known restructuring expert and bankruptcy financial advisor, and was contemplating a bankruptcy filing. (*Id.* ¶ 87.) The company filed for bankruptcy two days later.

By April 18, 2001, the revelations of Winstar's financing difficulties and true financial condition, combined with Grubman's relentless optimism in the face of other analyst reports warning of precisely the omissions of which plaintiffs now complain, were sufficient to serve as "storm warnings" that should have put the ordinary investor on notice of the probability of the fraud alleged here. *See, e.g., LC Capital,* 318 F.3d at 155. Moreover, in the months and years before the stark contrast between the truth about Winstar and Grubman's rosy predictions was revealed, the financial press was flooded with stories about pervasive conflicts of interest between research and investment banking at

major Wall Street firms, including SSB, and the incentives that such conflicts created for analysts, including Grubman specifically, to adopt a more optimistic attitude about certain stocks than objective analysis could support. (*See* Rosen Decl. Ex. 29 at 31–45.) Of course, just as allegations about conflicts of interest, standing alone, are insufficient to state a claim for securities fraud, *see Level 3*, at 492, these numerous articles, standing alone, would not suffice for inquiry notice of the fraud alleged here. *See In re WorldCom Sec. Litig.*, 02 Civ. 3288(DLC), 2003 WL 22790942, at *5–6 (S.D.N.Y. Nov. 25, 2003). However, even if only a small fraction of the articles cited by defendants should be imputed to the knowledge of a "reasonable investor," the prevalence of these reports, in combination with the facts about Winstar, is sufficient in the context of this case to "alert any reasonable investor that something is seriously wrong" with the SSB research coverage of Winstar. *LC Capital*, 318 F.3d at 155. As plaintiffs concede that they undertook no investigation whatsoever until July 2002, when numerous regulatory investigations of these and other events were revealed to the public (P. Mem.20), they will be charged with notice of their claims as of April 18, 2001. *See WorldCom*, 2003 WL 22790942 at *4 ("if an investor makes no inquiry, knowledge of the claim will be imputed as of the date the duty to inquire arose.") (citing *LC Capital*).

This case is readily distinguishable from two recent cases cited by plaintiffs in their briefing. (P. Mem.21–23.) In *WorldCom*, the SSB defendants sought to rely on many of the same press reports cited in their briefing here to argue that the WorldCom plaintiffs were on inquiry notice of their claims arising from SSB analyst reports from at least September 2000, although WorldCom did not announce its financial restatements until July 2002 (which revelations formed the factual basis

for the fraud alleged). *Id.* at *4–5. In that case, Judge Cote held that the press reports alone, in advance of specific revelations about WorldCom's accounting problems, did not sufficiently reveal the details of the allegations against the SSB defendants so as to put plaintiffs on inquiry notice of those claims. *Id.* at *5. Likewise, the claims here are not time-barred because of press reports on conflicts—they are barred because those reports contributed to the background of information available to a reasonable investor when he learned, through Winstar's highly-public collapse and bankruptcy filing, of the true facts about Winstar's financial condition, as contrasted with the statements made about those same facts by Grubman and SSB. In *Global Crossing*, 313 F.Supp.2d 189, 202–203 (S.D.N.Y.2003), this Court held that plaintiffs there should not be charged with knowledge as a matter of law on the very date of inquiry notice, although plaintiffs did not clearly allege that they had immediately commenced an investigation into their claims. However, the Global Crossing plaintiffs did commence an investigation "at a minimum within a few months after inquiry notice arose," *id.* at 203, which the Court contrasted with the plaintiffs in *LC Capital*, "who waited a year after being put on inquiry notice to take action." *Id.* The posture of plaintiffs here is quite different from that of the Global Crossing plaintiffs, and no similar exception from the rule of *LC Capital* is warranted, as plaintiffs concede that they made no inquiry whatsoever until the entirety of their eventual complaint was dished up on a platter by regulatory authorities in July 2002.

■ Prior to the enactment of the Sarbanes–Oxley Act on July 30, 2002, the relevant statute of limitations for the claims here was within three years after the violation alleged and within one year

after discovery of the facts constituting the violation; Sarbanes–Oxley changed both periods, to five years and two years, respectively. 28 U.S.C. § 1658(b). Although the briefing on the motion to dismiss devotes considerable space to the question of which statute of limitations should apply to this action, that question has been authoritatively resolved by the Second Circuit's recent decision in *In re Enterprise Mortgage Acceptance Co. Sec. Litig.*, 391 F.3d 401 (2d Cir.2004). The extended statute of limitations provided by Sarbanes–Oxley does *not* operate "retroactively to revive plaintiffs' previously expired securities fraud claims." *Id.* at 403. As plaintiffs here were on inquiry notice of their claims by April 18, 2001, those claims expired before the passage of Sarbanes–Oxley. The first complaint in this action was not filed until August 2, 2002, and accordingly all of plaintiffs' claims are time-barred and must be dismissed.[2]

## CONCLUSION

For the reasons discussed above, plaintiffs' claims are time-barred and the Complaint is accordingly dismissed with prejudice.

SO ORDERED.

---

**2.** Because all of plaintiffs' claims are time-barred, the Court need not reach defendants' other arguments for dismissal.