NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0147n.06
Filed: February 24, 2006

No. 05-3384

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ROBERT GREENBURG, HANS GAVERSTROM, ICARUS TRADING INC., HGK ASSET MANAGEMENT INC., and JFK INVESTMENT CO., | ) ) ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | |
| GLEN HINER, et al., | ) ) | |
| Defendants-Appellees. | ) ) ) | |

BEFORE: KENNEDY, COOK, and GRIFFIN, Circuit Judges.

PER CURIAM.

Plaintiffs appeal an order of the district court dismissing their complaint, filed on January 27, 2003, as time-barred by the statute of limitations. FED. R. CIV. P. 12(b)(6). We affirm.

I.

This is a securities fraud action pursuant to sections 10(b) & 20(a) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. §§ 78j(b) & 78t(a), respectively.[1] The plaintiffs are Robert

---

[1]Greenburg and the other named plaintiffs moved to consolidate their cases. The district court entered a joint stipulation and order consolidating the cases in July 2003.

Greenburg and a proposed class[2] of individual and institutional investors[3] (collectively "Greenburg") who purchased Owens Corning ("OC") stock between September 20, 1999, through October 4, 2000 ("the class period"). The defendants-appellees are former Chairman/CEO Glen Hiner and five other current or former officers or directors of OC (collectively "Hiner"). OC, a maker of building materials and a past manufacturer of asbestos products, was sued by thousands of people in the 1980s and 1990s claiming that asbestos exposure caused or exacerbated their adverse health conditions. In 1997, OC purchased the Fibreboard Corporation, which also was the subject of lawsuits alleging asbestos-related health problems.

During the class period, the price of a share of OC stock fell from $20 to $28 in September 1999 to only fifty cents in October 2000. When Greenburg filed his initial complaint in January 2003, OC stock was down even further, to five cents per share, where it remained when the amended consolidated class complaint ("the amended complaint") was filed in September 2003.

The amended complaint alleges that the class purchased their stock at an artificially inflated price in reliance on materially false and misleading statements by OC. The allegedly offending

---

[2]The plaintiffs had not yet moved to certify the class. In any event, the usual and preferred practice is to rule on any pending motion to dismiss before addressing class certification. *See, e.g., County of Riverside v. McLaughlin*, 500 U.S. 44, 48 (1991) ("In light of the pending motion to dismiss, the District Court continued the hearing on the motion to certify the class."); *Heckler v. Ringer*, 466 U.S. 602, 610 n.5 (1984) ("Respondents requested certification of a class . . . but the District Court dismissed the complaint before ruling on the class certification question."); *Kilgore v. Outback Steakhouse of Fla., Inc.*, 160 F.3d 294, 296 n.1 (6th Cir. 1998) ("The magistrate judge dismissed the plaintiff's claims before ruling on the class certification motion.").

[3]There are three named institutional plaintiffs and one other named individual plaintiff: Hans Gaverstrom, Icarus Trading, Inc., JFK Investment Co. LLC, and HGK Asset Management, Inc. All these plaintiffs jointly filed the notice of appeal with Greenburg.

statements were contained in OC's quarterly Securities Exchange Commission ("SEC") disclosure reports, its wire and press releases, and its officers' interviews and other public statements. According to the amended complaint, Hiner participated in providing inaccurate information that made those statements false or misleading, or withheld information that was needed to make those statements *not* false or misleading.

Hiner allegedly falsely stated that OC's reserve was sufficient to cover payouts from its National Settlement Program ("NSP"); that its Fibreboard Trust was sufficient to cover payouts related to that subsidiary's asbestos liability; and that the initial 440,000 settlements would be paid by the end of 2000. Greenburg also alleges that, for one year, Hiner withheld the fact that OC had asked the claimants' lawyers to defer large payouts from its Fibreboard Trust, which they refused.

Through these statements, Greenburg alleges Hiner knowingly understated the size of OC's asbestos liabilities, the period it would take to settle claims, and the amount it would have to pay each claimant. Moreover, according to Greenburg, Hiner knowingly *over*stated the adequacy of its reserve and Fibreboard Trust to cover settlement payouts; made OC's cashflow sound more predictable and positive than it was; and generally painted an unduly rosy picture of OC's financial health and its ability to weather its asbestos liabilities.

II.

The district court found that Greenburg had inquiry notice of possible fraud no later than November 2000, and we agree. By November 2000, OC had, in rapid succession, disclosed its request to defer *half a billion dollars* in scheduled NSP settlement payments in order to keep

payments down to previously stated amounts; disclosed that it was taking a $1 billion charge to increase its asbestos liability reserve, which it had previously assured the public was adequate; filed for bankruptcy, specifically citing its inability to meet its asbestos liabilities; and belatedly disclosed its unsuccessful request to defer substantial settlement payments from its Fibreboard Trust.

Specifically, among other things, in October 2000, OC's stock price continued to collapse: in two months, it fell from a range of about $5 to $6 to a range of only *fifty cents* to $2.81. At the same time, on October 5, 2000, OC and seventeen of its subsidiaries filed for reorganization under Chapter 11, *see In re Owens Corning*, 419 F.3d 195, 201-02 (3d Cir. 2005), *petition for cert. filed*, 74 U.S.L.W. 3395 (U.S. Dec. 23, 2005) (No. 05-827), and the bankruptcy trustee appointed a committee of unsecured creditors to help administer OC's assets and obligations.

The petition left little doubt that OC viewed its supposedly manageable asbestos liabilities as insurmountable without bankruptcy protection. A contemporaneous press account reported,

> Owens Corning today announced that, *in order to address the growing demands on its cash flow resulting from its multi-billion dollar asbestos liability*, the company has voluntarily filed for reorganization under Chapter 11 of the U.S. Bankruptcy Code.
>
> . . . .
>
> Glen H. Hiner, Chairman and Chief Executive Officer of Owens Corning, said, "We are voluntarily taking this difficult but necessary action today to resolve the company's asbestos liabilities in a manner that legally binds all existing and future claimants. . . . .
>
> . . . .
>
> Mr. Hiner said, "We have been attempting to manage this liability for more than two decades. . . . . [W]e made substantial progress in the management of our asbestos liability with our National Settlement Program (NSP). However, the cost of resolving current and future claims, together with a flurry of recent new filings from

> plaintiff lawyers not participating in the NSP, led us to the conclusion that a Chapter 11 reorganization was prudent and necessary.

*Owens Corning Files Voluntary Chapter 11 Petition to Resolve Asbestos Liability*, PRNEWSWIRE,

Oct. 5, 2000, available at http://www.prnewswire.com.  About five weeks later, on November 14,

2000, OC filed its quarterly 10-Q report with the SEC, stating in part,

> The NSP achieved [its] goals in many respects and also facilitated the negotiation of the deferral of payments to NSP participants earlier this year.  As discussed in more detail below, however, Owens Corning's inability to obtain ongoing financing on acceptable terms, the lack of support for additional payment deferrals, the higher than anticipated number of asbestos-related claims (which adversely affected the Company's estimated liquidity needs through 2004), and the recent deterioration of Owens Corning's operations, resulted in the decision by Owens Corning to make the Filing.

> When the stated reason for a bankruptcy petition is the inability to keep up with liabilities

the company had regularly assured investors it could manage, a bankruptcy filing can be "the last

straw" in creating inquiry notice.  *Theoharous v. Fong*, 256 F.3d 1219, 1228 (11th Cir. 2001).  As

the Eleventh Circuit held in a sufficiently similar situation,

> Roadmaster filed for bankruptcy on August 29, 1997.  Roadmaster's announcement that it was filing for bankruptcy was an indication that its previous reports of solid financial health were inaccurate.  Indeed, Roadmaster publicly stated a week before it filed for bankruptcy that "it has been experiencing substantial cashflow deficiencies and financial difficulties, and its manufacturing facilities have been temporarily shutdown until this situation is resolved" (the "August 22 release").  These facts were sufficient to put Schuette on inquiry notice of the possibility that Roadmaster had violated Section 10(b) with its prior assurances of financial health.

*Id.*[4] Likewise, the bankruptcy filing and OC's explanation for the filing reinforced and strengthened the cumulative effect of the prior storm warnings and suspicious facts, giving Greenburg inquiry notice if he did not have it already.

For the reasons stated by the district court's opinion, which we hereby adopt as our own, we hold that under either the former one-year statute of limitations or under the new two-year statute of limitations (enacted by the Sarbanes-Oxley Act of 2002, codified at 28 U.S.C. § 1658), plaintiffs' January 2003 complaint was filed after the expiration of the statute of limitations.  *See also Shah v. Meeker*, No. 04-5965-CV, – F.3d –, 2006 WL 147503, at *4 (2d Cir. Jan. 20, 2006) ("Where inquiry notice is clearly established, dismissal of a securities fraud complaint as untimely may be readily affirmed.").

Affirmed.

---

[4]*Accord, e.g., In re Salomon Analyst Winstar Litig.*, 373 F. Supp. 2d 241, 245-46 (S.D.N.Y. 2005) (bankruptcy filing, coupled with other analysts' previous warnings about company's financial difficulties, gave investors inquiry notice of their claims that defendant analyst issued false and misleading research reports that did not disclose the company's precarious financial condition); *BRS Assocs. LP v. Dansker*, 246 F. Supp. 2d 755, 770 (S.D.N.Y. 2000) (investors and creditors were on inquiry notice when they learned that company was in bankruptcy proceedings); *Phillips v. Kidder, Peabody & Co.*, 933 F. Supp. 303, 312 (S.D.N.Y. 1996) (bankruptcy filing necessarily put investors on notice to inquire about possible fraud), *aff'd*, No. 96-7959, 108 F.3d 1370, 1997 WL 138814 (2d Cir. Mar. 17, 1997); *Gruber v. Price Waterhouse*, 697 F. Supp. 859 (E.D. Pa. 1988) (limitations period began to run on false-registration-statement claim when investors became aware that company had reported large losses and filed for bankruptcy), *aff'd*, 911 F.2d 960 (3d Cir. 1990).