Tom **GONZALES and Birch Ventures LLC, Plaintiffs,**

v.

**NATIONAL WESTMINSTER BANK PLC, Defendant.**

No. 11–cv–1435 (BSJ).

United States District Court, S.D. New York.

March 6, 2012.

Martin A. Schainbaum, Martin A. Schainbaum, Esq., San Francisco, CA, Stuart A. Smith, Law Offices of Stuart A. Smith, New York, NY, for Plaintiffs.

Michael Everett Swartz, Schulte Roth & Zabel LLP, New York, NY, for Defendant.

### Order

BARBARA S. JONES, District Judge.

This case involves allegations of fraud made in connection with Defendant's involvement in a tax shelter structure and the loans it provided in pursuit of that tax scheme. Plaintiffs, Tom Gonzales and his wholly owned venture, Birch Ventures LLC, assert five fraud-related claims against Defendant, National Westminster Bank PLC ("NatWest").[1] For the reasons that follow, Defendant's Motion to Dismiss is GRANTED.

### BACKGROUND

The Amended Complaint (or "Complaint") alleges a "conspiracy by banks, including NatWest, charging fees on sham loans." (Am. Compl., ¶ 1.) In overview, the Complaint describes how Gonzales invested a $22.23 million "initial capital contribution" to an investment fund, Logan Strategic Investment Fund, LLC ("Logan"). Of that sum, he claims he lost $17,094,059 due to NatWest's fraudulent conduct in managing that "investment." He now seeks to recover that loss.

The details of NatWest's fraud are alleged as follows: On or about January 20, 2000, Gonzales formed Birch Ventures LLC ("Birch Ventures"). (Am. Compl., ¶ 11.) In March 2000, Birch Ventures, on the advice of its agent, Presidio Resources, LLC ("Presidio"), entered into a credit agreement with NatWest for a $912 million loan, with a stated principal of $570 million and a $342 loan "premium." (Am. Compl., ¶ 13.) On March 31, 2000, NatWest opened an account for Birch Ventures and Gonzales deposited $22.23 million of his own funds in the account. (Am. Compl., ¶ 15.)

On April 10, 2000, all the funds in the Birch Venture account (which included the purported loan funds and Gonzales' $22.23 million contribution) were transferred to the Logan Investment Fund, which was managed by Presidio. (Am. Compl., ¶ 18.) On June 5, 2000, Gonzales withdrew Birch Venture's investment in Logan and on June 13, 2000, NatWest returned

---

1. The Royal Bank of Scotland is the successor to NatWest.

$5,135,941 to Gonzales, reflecting a $17,094,059 loss. (Am. Compl., ¶¶ 19–21.)

The crux of Plaintiffs claim is that the $912 NatWest loan was a sham, yet the bank nonetheless charged Plaintiffs high fees and interest on those "borrowed" funds, as though there was a bona fide loan. In their Opposition to the Motion to Dismiss, Plaintiffs describe the spurious nature of the loan: that is, although Nat-West purported to "loan" $912 million to Birch Ventures, there was never any "real" loan because "NatWest was flatly unwilling to put any of the 'loan' funds at risk for any of Presidio's investor clients, including Gonzales," meaning that the funds "stayed put in a NatWest account ... that prevented them from ever being invested by Presidio" in Logan. (Opp. to Mot. to Dismiss at 5.) As further confirmation that the loan was a sham, the "required collateral exceeded the amount of the loan[,] thereby ensuring that there was no loan in any realistic sense of the word." (*Id.*) As stated, this fake loan was Nat-West's purported basis for charging Plaintiffs the various management fees and interest that comprised the bulk of their $17,094,059 loss. (Am. Compl., ¶¶ 25, 30, 48, 49.)

In addition to the facts stated in the Complaint, the Court believes it is important to provide some additional factual context to Plaintiffs' allegations, drawn from news articles, public documents, and case law, all of which the Court may take judicial notice.

The transaction described above arose in connection with a tax shelter strategy known as a Bond Linked Issue Premium Structure ("BLIPS") that was created and marketed by KPMG and Presidio between 1999 and 2000.[2] (Ex. 1, at 111.) The purpose of the BLIPS was "to create the appearance of investment activity, but taxpayers were entering into these transactions for the primary purpose of avoiding taxes, as opposed to making profits on the transactions." Chad Bray, *Deutsche Punished On Bogus Shelters*, Wall St. J., Dec. 22, 2010, http://online.wsj.com/article/SB 20001424052748703581204576033761692111074.html; *see also Tayebi v. KPMG, LLP*, No. 105471/07, 18 Misc.3d 1139(A), 2008 WL 518149, at *2–3 (N.Y.Sup.Ct. Feb. 20, 2008).

BLIPS operated by providing an investor with an artificially high tax basis in a partnership through the use of an LLC that the investor owned. The LLC would obtain a large loan from a bank, some portion of which was considered a "premium"; the proceeds would then be assigned to the partnership. For tax purposes, the investor considered a portion of the loan (usually the "premium") to be a contribution to the partnership, rather than a liability that the partnership had to repay. (Ex. 1, at 111–13.) When the investor withdrew the LLC's investment in the partnership (usually 60–180 days later) the investor's capital distribution was smaller than the initial "contribution" because the partnership had to repay the bank loan before distributing remaining assets. The investor's losses from that transaction could then be used to offset taxable gains elsewhere. (*Id.*) Beginning in 1999, however, the IRS began to suggest that it might not recognize tax losses arising from the BLIPS, and ultimately, it decided it would not. (I.R.S. Notice 99–59, 1999–52 C.B. 761; I.R.S. Notice 2000–44, 2000–36 C.B. 255, Exs. 4–5, Schainbaum Decl.)

Plaintiffs concede that the loan with NatWest was part of a BLIPS transaction (Opp. to Motion to Dismiss at 15.) but, like

---

**2.** Court may take judicial notice of publicly available information including newspaper articles and other public disclosures. *GVA* *Mkt. Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd.*, 580 F.Supp.2d 321, 328 (S.D.N.Y.2008).

many other wealthy investors before them, now seek to recover their "losses" on the ground that the lending institution engaged in fraudulent conduct in orchestrating the scheme. Specifically, Plaintiffs here assert causes of action for breach of fiduciary duty, fraud and conspiracy to commit fraud, fraudulent concealment, aiding and abetting fraud, and aiding and abetting beach of fiduciary duty. Before the Court is NatWest's Motion to Dismiss.

## LEGAL STANDARD

On a motion to dismiss pursuant to Rule 12(b)(6), all factual allegations in the complaint are accepted as true, and all inferences are drawn in favor of the pleader. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993). " 'The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims . . . .' " *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.1995) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 235–36, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Plaintiffs must allege sufficient facts to "nudge[ ] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955.

A complaint may also be dismissed if the claims alleged therein are time-barred. "[W]here the facts needed can be gleaned from the complaint, papers integral to the complaint, and publicly disclosed documents, 'resolution of the [limitations] issue on a motion to dismiss is appropriate' and has been done in the Second Circuit 'in a vast number of cases.' " *In re Salomon Analyst Winstar Litig.*, 373 F.Supp.2d 241, 245 (S.D.N.Y.2005) (quoting *LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 156 (2d Cir.2003)). Here, even assuming as true all factual allegations set out in the Amended Complaint, the Court finds that Plaintiffs' claims are untimely and, therefore, that they have failed to state a claim for relief.

## DISCUSSION

Under New York law, an action based on fraud must be brought within six years of the commission of the alleged fraud, or two years from when a plaintiff was aware (had specific notice) or should have been aware of enough facts such that they could have discovered the fraud with reasonable diligence (had "inquiry notice"). N.Y. C.P.L.R. §§ 213(8), 203(g). This is known as the "discovery rule." That limitations period applies to Plaintiffs' breach of fiduciary duty claims as well because the allegations of fraud are central those claims. *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 879 N.Y.S.2d 355, 907 N.E.2d 268, 272 (2009). Here, it is clear that Plaintiffs were on notice of NatWest's alleged fraud (*i.e.*, its role in providing false loans in furtherance of BLIPS tax shelter structures) more than two years before the Amended Complaint was filed in March 2011.

By 2003, and perhaps earlier, the BLIPS strategy and the fraud associated with it had been brought into the public light by the media, the U.S. Government, and the courts. In 2003, the United States Congress began to scrutinize the BLIPS strategy. A November 2003 Senate Subcommittee on Investigation publicly released a Senate Report entitled, *U.S. Tax Shelter Industry: The Role of Accountants, Lawyers, and Financial Professionals: Four KPMG Studies: FLIP, OPIS, BLIPS, and SC2.* (Ex. 1.)

The contents of that report mirror in many respects the factual allegations in Plaintiffs' suit. For instance, in reference to the BLIPS strategy, the Report stated: "[m]ajor banks, such as Deutshe .Bank, HVB, UBS, and NatWest, provided purported loans for tens of millions of dollars essential to the orchestrated transactions ... [but] the funds 'loaned' by the banks were never really put at risk." (Ex. 1, at 9–10.) It also stated that "Presidio's principals also helped KPMG obtain lending and securities services from three major banks, Deutsche Bank, HVB, and NatWest, to complete ... BLIPS transactions. (Ex. 1, at 63.) It continued: "NatWest apparently also participated in a significant number of BLIPS transactions in 1999 and 2000, provided credit lines totaling more than $1 billion." (Ex. 1 at 72.)

The Senate Report and the Public Hearings accompanying its release were reported in the press, by the *Wall Street Journal* (Ex. 7, *KPMG Insiders Questioned Shelter—Senate Panel's Report Says Firm Disregarded Partners' Concerns on Capital Gains,* Wall St. J. (Nov. 19, 2003)) and in a February 2004 two-part *Frontline* report. (Ex. 9, "Tax Me If You Can.") Plaintiffs do not attempt to argue they were unaware of the Report, but rather contend that it would not have put them on notice of the fraud that they allege because it did not, technically speaking, make a congressional "finding of fact" that the banks in question never meaningfully made the loans in question. That argument elevates form over substance: the Report unequivocally explores the fact that NatWest did not make bona fide loans in connection with the BLIPS transactions.

In addition to the Senate Report, there were numerous other investor-suits against BLIPS banks, like NatWest, that alleged facts similar to those presented here, by similarly situated plaintiffs. For one, the class action complaint in *Simon et al. v. KPMG LLP et al.,* No. 05–cv–3189 (D.N.J.), filed in June 2005, specifically alleged that banks, including NatWest, provided loans for BLIPS transactions, earning them millions of dollars in fees but never actually provided a bona fide loan. (Ex. 2., ¶¶ 8, 108, 134.) The settlement agreement in that case—which included notice of the allegations involved—was not only sent to 246 potential class members, but was also published in the *Wall Street Journal* and the *Newark Star Ledger* in November 2005.[3] (Ex. 15, at 2–3.) That fact that the case had settled was also reported in the *New York Times* and the *Wall Street Journal.* (Exs. 16, 17.)

The facts alleged in *Klamath Strategic Investment Fund LLC v. United States,* 472 F.Supp.2d 885 (E.D.Tex.2007), were also markedly similar to those at bar. There, two former BLIPS investors sued the IRS for disallowing the BLIPS associated losses that were generated by loans provided by NatWest. The *Klamath* Court specifically found that "NatWest did not make any loans" because the bank had no actual credit risks: NatWest understood that the loan funds would never be used for the foreign currency trading upon which the transaction was premised and had demanded collateral that exceeded the amount of the loan. *Id.* at 897–98. Again, these are substantially the same facts that Plaintiffs allege to show that their loan with NatWest was a sham. Like the Senate Report and the *Simon* class action and settlement, the *Klamath* decision was not obscure; the *New York Times* reported on the case, writing that the Klamath Court "found that Blips was not a real invest-

---

**3.** Notice of the amended stipulation of settlement was provided in the same manner in March 2006.

ment at all, that its loans were fake and that it had no economic substance or genuine business purpose." The *Times* article further speculated that the decision could lead to litigation against NatWest. (Ex. 3, Lynnley Browning, *Court Rejects Tax Shelter Once Sold by KPMG* (Feb. 2, 2007).)

In light of all of this information in the public domain, the Court is unconvinced by Plaintiffs' claim in its Opposition Memorandum that it was not until May 4, 2009, with the docketed testimony of Presidio official Amir Makov, that they could have learned of the "underlying details" of the fraud. (Opp. to Mot. to Dismiss at 2, 12.)[4]

Indeed, in a similar situation, the New York Supreme Court found claims filed in 2007 against a BLIPS lending bank were time-barred based on application of the discovery rule. Specifically, the *Tayebi v. KPMG* Court found that IRS announcements and media coverage of the BLIPS transactions, as well as similar lawsuits, all put the plaintiffs *on* inquiry notice. 2008 WL 518149, at *7. This Court believes it appropriate to take guidance in applying New York's statutes of limitations from the New York State courts and, in so doing, is similarly persuaded that the substantial amount of media attention, litigation activity, and Government pronouncements provided inquiry—if not specific—notice to the Plaintiffs in this case of the facts surrounding their alleged fraud.

 The Court rejects Plaintiffs' arguments that NatWest fraudulently concealed its activities, thereby preventing inquiry notice ·and tolling the limitations period. The doctrine that they advance—

equitable estoppel—is unavailable to them. In the fraudulent misrepresentation or concealment context, "the equitable estoppel doctrine is not available to a plaintiff who possesses timely knowledge sufficient to place him or her under a duty to make and ascertain all the relevant facts prior to the expiration of the applicable statute of limitations." *Malone v. Bayerische Hypo–Und Vereins Bank,* No. 08–cv–7277, 2010 WL 391826, at *11 (S.D.N.Y. Feb. 4, 2010); *see also Sierra Rutile Ltd. v. Katz,* No. 09–CV–4913, 1995 WL 622691, at *7 (S.D.N.Y. Oct. 24, 1995) (rejecting argument that fraudulent concealment tolls the limitations period in fiduciary duty context). Here, "[b]ecause the [Plaintiffs] were on notice of the alleged fraudulent misconduct long before the expiration of the applicable statutes of limitations ..., they may not claim the benefits of equitable tolling under the doctrine of fraudulent concealment." *Malone,* 2010 WL 391826, at *11.

In any event, Plaintiffs have not alleged any specific acts of concealment. At most, they claim that NatWest failed to provide account statements directly to Gonzales. However, they concede that those statements were given to Presidio, Gonzales' agent. (Reinhardt Decl., ¶ 6.) Therefore, they have not stated a conceivable, let alone plausible, basis for a fraudulent concealment claim.

## CONCLUSION

For the reasons stated above, Defendant's Motion to Dismiss is granted. The clerk of the court is directed to terminate

---

4. NatWest also points to the numerous criminal indictments, pleas, and deferred prosecution agreements that arose between 2005 and 2008 against banks and high level bank officials regarding their BLIPS involvement. (Mot. to Dismiss at 11.) Most notably, Makov pled guilty to BLIPS related charges on Sep-

tember 10, 2007. The *New York Times* reported on that plea, stating that BLIPS "had neither real loans nor a real investment component ... there was no economic substance." (Ex. 33, Lynnley Browning, *Guilty Plea Seen Aiding Tax Shelter Prosecution* (Sept. 11, 2007).)

the motion at docket entry number 8 and to close the case.

**SO ORDERED.**